Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Gregory and Judges Motz,-King, Duncan, Keenan, Wynn, Floyd, Thacker, and Harris joined. Judge Motz wrote a concurring opinion in which Judges Keenan and Harris joined. Judge Niemeyer wrote a dissenting opinion in which Judge Shedd joined. Judge Agee wrote a dissenting opinion in which Judges Niemeyer, Traxler, Shedd, and Diaz joined.

ON REHEARING EN BANC

WILKINSON, Circuit Judge:
This case requires that we decide whether Rowan County’s practice of lawmaker- *272 led sectarian prayer runs afoul of the Establishment .Clause. For years on .end, the elected members of the county’s Board of Commissioners composed and delivered pointedly sectarian invocations. They rotated the prayer, opportunity amongst themselves; no one else was permitted to offer an. invocation. The prayers referenced one and only one faith and veered from time to time into overt proselytization. Before each invocation, attendees were requested to rise and often asked to pray, with the commissioners. The prayers served.to open meetings of our most basic unit of government and directly preceded the. business session of the meeting. The district court, applying the Supreme Court’s decision in Tom of Greece v. Galloway, — U.S. —, 134 S.Ct 1811, 188 L.Ed.2d 835 (2014), held the county’s prayer practice unconstitutional. A panel of this court reversed. See Lund v. Rowan Cty., 837 F.3d 407 (4th Cir. 2016). The full court then granted rehearing en banc.
We conclude that the Constitution does not allow what happened in Rowan County. The prayer practice served to identify the government with Christianity and risked conveying to citizens of minority faiths a message of exclusion. And because the commissioners were the exclusive prayer-givers, Rowan County’s invocation practice falls well outside the more inclusive, minister-oriented practice of legislative prayer described in Town of Greece, Indeed, if elected representatives invite their constituents to participate in prayers invoking a single faith for meeting upon meeting, year after.year, it is difficult to imagine constitutional limits to sectarian prayer practice.
The great promise of the Establishment Clause is that religion will not operate as an instrument of division in our nation. Consistent with .this principle, there is a time-honored tradition of legislative prayer that reflects the respect of each faith for other faiths and the aspiration, common to so many creeds, of finding higher meaning and deeper purpose in these fleeting moments each of us spends upon this earth. Instead of drawing on this tradition, Rowan County elevated one religion above all others and aligned itself with that faith. It need not be so, As the history of legislative invocations demonstrates,- the desire of this good county for prayer at the opening of its public sessions-can be realized in many ways that further both religious exercise and religious tolerance.
I.
A.
We begin by describing the challenged prayer practice itself. Rowan County, North Carolina is governed by an elected body known as the Rowan County Board of Commissioners. The five-member Board convenes twice a month. The commissioners sit at the front of the room facing their constituents.
Each Board meeting begins in the same way: with a prayer, composed and delivered by one of the. commissioners. After calling the meeting to order, the chairperson asks everyone in attendance—commissioners and constituents alike—to stand up. All five Board members rise and bow their heads, along with most of the attendees. A commissioner then asks the community to join him in worship, using phrases such as “Let us pray,” “Let’s pray together,” or “Please pray with me.” The invocations end with a communal “Amen,” and the Pledge of Allegiance follows a moment later, Next,- the Board typically approves the previous meeting’s minutes, schedules future items of business, and holds a public comment period before continuing on to-the day’s work.
*273 Board members rotate the prayer opportunity amongst themselves as a matter of long-standing custom. The content of the prayer is “entirely at the discretion of the commissioner.” J.A. 284.[1] No one outside the Board is permitted to offer an invocation.
The prayers are invariably and unmistakably Christian in content. Over the five- and-a-half years for which video recordings are available, 97% of the Board’s prayers mentioned “Jesus,” “Christ,” or the “Savior.” See Lund v. Rowan Cty., 103 F.Supp.3d 712, 714 (M.D.N.C. 2015). No religion other than Christianity was represented. Sectarian references often appeared at the conclusion of the prayer. See, e.g., S.A. 14 (prayer of April 21, 2008) (“I ask all these things in the name of Jesus, the King of Kings and the Lord of Lords. Amen.”). Several prayers confessed sin and asked for forgiveness on the community’s behalf. See, e.g., S.A. 30 (prayer of August 1, 2011) (“Lord, we confess that we have not loved you with all our heart, and mind and strength, and that we have not loved one another as Christ loves us. We have also neglected to follow the guidance of your Holy Spirit, and have allowed sin to enter into our lives.”). Other prayers implied that Christianity was superior to other faiths. See, e.g., S.A. 33 (prayer of March 5, 2012) (“[A]s we pick up the Cross, we will proclaim His name above all names, as the only way to eternal life.”). On occasion, Board members appeared to implore attendees to accept Christianity. See, e.g., S.A. 21 (prayer of October 5, 2009) (“Father, I pray that all may be one as you, Father, are in Jesus, and He in you. I pray that they may be one in you, that the world may believe that you sent Jesus to save us from our sins.”).
In response to the growing controversy over the prayer practice, a number of commissioners publicly announced that they would continue delivering Christian invocations for the community’s benefit. Prior to the filing of this lawsuit, the American Civil Liberties Union of North Carolina Legal Foundation notified the Board that sectarian prayers violated'the Establishment Clause under then-applicable Fourth Circuit precedent. The Board did not respond, but several members stated that they would not stop praying in Jesus’ name. “[A]sking for guidance for my decisions from Jesus,” one commissioner explained, “is the best I, and Rowan County, can ever hope for.” Lund, 103 F.Supp.3d at 715 (quoting Commissioner Ford). Another commissioner remarked-, “I volunteer to be the first to- go to jail for this cause....” Id. (quoting Commissioner Sides). After the district court enjoined the county prayer practice, a third commissioner issued a statement noting, “I will always pray in the name of Jesus..,. God will lead me through this persecution and I will be His instrument.” See Pls.’ Mem. Law Supp. Mot. Summ, J. at 9 (quoting Commissioner Barber).
B.
The three plaintiffs in this case are longtime residents of Rowan County. Active in the community, each one has attended multiple Board meetings to follow issues of public importance. Nancy Lund, a volunteer tutor, cares about school funding. So doe’s Liesa Montag-Siegel, a retired middle school librarian. Robert Voelker is interested in education policy and the county’s provision of social services. The plaintiffs, none of whom identify as Christian, encountered prayers of the sort described above at Board meetings.
In March 2013, Lund and her co-plaintiffs filed this action against Rowan Coun *274 ty, asserting that the Board’s prayer practice violated the Establishment Clause. They argued that the Board, by delivering exclusively Christian prayers, affiliated the county with Christianity, advanced Christianity, and coerced the plaintiffs into participating in religious exercises. According to the plaintiffs, the prayers “sen[t] a message that the County and the Board favor Christians” and caused the plaintiffs to feel “excluded from the community and the local political process.” J.A. 11-12. The plaintiffs also averred that they felt compelled to stand for the invocations to avoid sticking out. Voelker added that he felt pressured to stand because “the invocation is immediately followed by the Pledge of Allegiance, for which [he] feels strongly that he needs to stand.” J.A. 12. At one meeting, Voelker proposed a nondenominational prayer and later worried that his “open questioning” of the Board’s sectarian invocations would impair his advocacy on other matters. J.A. 13. The plaintiffs sought declaratory and injunctive relief as well as a preliminary injunction against sectarian prayers at Board meetings.
Rowan County responded with affidavits from each Board member adding new details on the prayer practice. According to these affidavits, the Board has no written policy on the invocations. The commissioners also claimed that the Board has “no expectation ... regarding the form or content” of the prayers, J.A. 291, which are offered “for the edification and benefit of the commissioners and to solemnize the meeting,” J.A. 293. Finally, the affidavits clarified that attendees may leave the room or arrive after the invocation and that the Board “respects the right of any citizen” to remain seated or disregard the invocation. J.A. 277.
After the district court preliminarily enjoined the Board from delivering sectarian prayers, the Supreme Court decided Town of Greece v. Galloway. The Court upheld the town’s practice of opening its legislative sessions with sectarian prayers and ruled that sectarian prayers, while subject to some limits, are constitutional as a general matter.
In light of Town of Greece, both the plaintiffs and Rowan County moved for summary judgment. The district court held that Rowan County’s prayer practice remained unconstitutional and issued a permanent injunction. Lund, 103 F.Supp.3d at 733-34. The court found that the practice was unconstitutionally coercive and “deviate[d] from the long-standing history and tradition” of legislative prayer. Id. at 723. That tradition, as articulated by the Supreme Court, involved the delivery of prayers by “a chaplain, separate from the legislative body.” Id. Here, the court reasoned, the prayers were “exclusively prepared and controlled” and delivered by the government, “constituting a much greater and more intimate government involvement in the prayer practice than that at issue in Town of Greece.” Id. Further, restricting the prayer opportunity to the Board resulted in “a closed-universe of prayer-givers ... who favored religious beliefs believed to be common to the majority of voters in Rowan County.” Id. The district court noted that although lawmaker-led prayer “is not per se unconstitutional,” the prayer-giver’s identity is relevant to the constitutional inquiry “in relation to the surrounding circumstances.” Id. at 722 n.4.
On appeal, this court reversed the district court’s judgment and upheld the county’s prayer practice. Lund, 837 F.3d at 411-31. The panel majority recognized that “[t]he five commissioners, all Christian, ‘maintained] exclusive and complete control over the content of the prayers.’ ” Id. at 434 (quoting Lund, 103 F.Supp.3d at 733). Nonetheless, the majority held that *275 the identity of the prayer-giver was not “a significant constitutional distinction, at least in the context of this case.” Id. at 420. Having discounted the source of the prayer as a relevant consideration, the majority next examined the other elements of the Board’s practice seriatim. The majority held that the practice was consistent with tradition as outlined in Town of Greece and was not coercive. Id. at 430.
Judge Wilkinson dissented. The dissent argued that the “combination of legislators as the sole prayer-givers, official invitation for audience participation, consistently sectarian prayers referencing but a single faith, and the intimacy of a local governmental setting exceeded] even a broad reading of Town of Greece.” Id. at 431 (Wilkinson, J., dissenting) (hereinafter panel dissent). After examining “the interaction among elements specific to this case,” id. at 433, the dissent concluded that the county’s prayer practice was unconstitutional.
We granted rehearing en banc, and we now affirm. Reviewing the district court’s decision de novo, see Simpson v. Chesterfield Cty. Bd. of Supervisors, 404 F.3d 276, 280 (4th Cir. 2005), we hold that Rowan County’s prayer practice violated the Establishment Clause of the First Amendment.
II.
“[A] moment of prayer or quiet reflection sets the mind[s] [of legislators] to a higher purpose and thereby eases the task of governing.” Town of Ghreece, 134 S.Ct. at 1825 (plurality opinion). Legislative prayer “lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society.” Id. at 1818 (majority opinion). Owing to its unique history and longstanding role in public life, legislative prayer occupies “a field of Establishment Clause jurisprudence with its own set of boundaries and guidelines.” Simpson, 404 F.3d at 281.[2]
But the general principles animating the Establishment Clause remain relevant even in the context of legislative prayer. First, the Constitution “affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any.” Lynch v. Donnelly, 465 U.S. 668, 673, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). Second, the government “may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which ‘establishes a [state] religion or religious faith, or tends to do so.’ ” Lee v. Weisman, 505 U.S. 577, 587, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (quoting Lynch, 465 U.S. at 678, 104 S.Ct. 1355). By “ensuring governmental neutrality in matters of religion,” Gillette v. United States, 401 U.S. 437, 449, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), the Establishment Clause safeguards religious liberty and wards off “political division along religious lines,” Lemon v. Kurtzman, 403 U.S. 602, 622, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). An instrument of social peace, the Establishment Clause does not become less so when social rancor runs exceptionally high.
In addition, “[b]y pairing the Free Exercise Clause with the Establishment Clause,” the Framers sought to prevent government from choosing sides on matters of faith and to protect religious minorities from exclusion or punishment at the hands of the state. Lund, 837 F.3d at 438 (panel dissent). “Americans are encour *276 aged to practice and celebrate their faith but not to establish it through the state.” Id.
In the legislative prayer context, the Supreme Court has given meaning to the abstract guarantees of the Establishment Clause by considering “historical practices and understandings.” Town of Greece, 134 S.Ct. at 1819 (internal quotation marks omitted). This history “shed[s] light on how the Founders viewed the Establishment Clause in relation to legislative prayer.” Lund, 837 F.3d at 414. The resulting principles, first elucidated in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), and refined in Town of Greece, reflect “what history reveals'was the contemporaneous understanding” of the Establishment Clause. Lynch, 465 U.S. at 673, 104 S.Ct. 1355.
Marsh and Torn of Greece, however, in no way sought to dictate the outcome of every subsequent case. The Court acknowledged that it has not “define[d] the precise boundary - of thé Establishment Clause.” Town of Greece, 134 S.Ct. at 1819. Accordingly, when the historical principles articulated by the Supreme Court dó not direct a particular result, a court must conduct a “fact-sensitive” review of the prayer practice. Id. at 1825 (plurality opinion).
Marsh and Town of Greece do not settle whether Rowan County’s prayer practice is constitutional. Those decisions did not concern lawmaker-led prayer, nor did they involve the other unusual aspects of the county’s prayer practice. And they certainly did not'address the confluence of these elements. That said, Marsh and Town of Greece provide our doctrinal starting point. We shall begin by describing the principles they developed and then proceed to apply those principles to this case.
A.
In Marsh v. Chambers, the Supreme Court upheld the Nebraska legislature’s practice of opening its sessions with nonsectarian prayers delivered by a paid chaplain. 463 U.S. at 793 n. 14, 103 S.Ct. 3330. The Court noted that legislative prayer “has coexisted with the principles of disestablishment and religious freedom” since the colonial period. Id. at 786, 103 S.Ct. 3330. In addition, the First Congress “authorized the appointment of paid chaplains” shortly after finalizing language for the First Amendment. Id. at 788, 103 S.Ct. 3330. Accordingly, the Court reasoned, the Framers could not have viewed “paid legislative chaplains and opening prayers as a violation of that Amendment.” Id.
Marsh, then, stands for the principle that “legislative prayer, while religious in nature, has long been understood as compatible with the Establishment Clause.” Town of Greece, 134 S.Ct. at 1818. But even as the Court concluded that legislative prayer is constitutional as a general matter, Marsh recognized certain limits on the practice. Namely, the prayer opportunity may not be “exploited to proselytize or advance [a particular faith] or to disparage any other.” Marsh, 463 U.S. at 794-95, 103 S.Ct. 3330.
Thirty years later, in Town of Greece v. Galloway, the Court held that sectarian prayer is not by itself unconstitutional. 134 S.Ct. at 1820. In that case, the town board in Greece, New York began its monthly meetings with sectarian invocations given by volunteer guest ministers. Id. at 1816. Because “nearly all of the congregations in town turned out to be Christian,” most of the ministers were Christian too. Id. at 1824. Nonetheless, the town also invited a Jewish layman and Baha’i practitioner to deliver prayers and granted a Wiccan priestess’s request to do so. Id. at 1817. The town “neither reviewed the prayers in *277 advance of the meetings nor provided guidance as to their tone or content.” Id. at 1816.
Invoking the historical tradition first described in Marsh, the Court held that the Establishment - Clause does not require “nonsectarian or ecumenical prayer as a single, fixed standard.” Id. at 1820. As. a result, “a challenge based solely on the content of a prayer will not likely establish a constitutional violation.” Id. at 1824 (emphasis added).
At the same time, the Court was quick to clarify that invocation content is still germane to the constitutionality of a prayer practice. The “relevant constraint” on faith-specific prayer “derives from its place at the opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation’s heritage.” Id. at 1828. Prayer that “invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing” serves that purpose. Id. But the Establishment Clause does not countenance prayers that “denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion” or, per Marsh, prayers that proselytize or advance or disparage a particular faith. Id.
Applying these principles, the Court concluded that the sectarian prayers offered by guest ministers fell within the historical .tradition outlined in Marsh, Id. at 1824. The Court also emphasized that Greece selected chaplains without discriminating among faiths and “welcome[d] a prayer by any minister or layman who wished to give one.” Id.
Finally, the Court concluded that the town’s prayer practice did not coerce participation by meeting attendees. Id. at 1828. While no single test commanded a majority, Justice Kennedy’s opinion for the plurality explained that. “[t]he analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person’s acquiescence in the prayer opportunity.” Id. at 1826.
B.
Marsh and Town of Greece thus show a Court generally supportive of legislative prayer, careful to emphasize that sectarian references are permissible in proper context, but cautioning that the prayer opportunity not get out of hand. This case differs from Marsh and Town of Greece in two crucial respects- that, in cómbinatión with other aspects of the Board’s prayers, give rise to an unprecedented prayer practice. First, whereas guest ministers delivered the prayers in those cases, the.legislators themselves gave the invocations in Rowan County. Second, the prayer opportunity here was exclusively reserved for the commissioners, creating a “closed-universe” of prayer-givers. Lund, 103 F.Supp.3d at 723. This case is therefore “more than a factual wrinkle on Town of Greece.” Lund, 837 F.3d at 431 (panel dissent). “It is a conceptual world apart.” Id.
To begin, Town of Greece simply does not address the constitutionality of lawmaker-led prayer. The Court has “consistently discussed legislative prayer practices in terms of invited ministers, clergy, or volunteers providing the prayer.” Lund, 103 F.Supp.3d at 722. And in elaborating on our . national tradition of legislative prayer—the history informing its interpretation of the Establishment Clause—the Court has “not once described a situation in which the legislators themselves gave the invocation.” Id. Town of Greece instead recounts, how “[t]he First Congress made *278 it an early item of business to appoint and pay official chaplains,” adding that “both the House and Senate have maintained the office virtually uninterrupted since that time.” 134 S.Ct. at 1818 (emphasis added).
To the extent that Town of Greece touches on the constitutional relevance of the prayer-giver’s identity, the decision takes for granted the use of outside clergy. The Court emphasized that the town “neither edit[ed] [n]or approv[ed] prayers” offered by the guest ministers. Id. at 1822. Addressing the fact that attendees were asked to stand, the plurality reasoned that “[t]hese requests ... came not from town leaders but from the guest ministers, who presumably are accustomed to directing their congregations in this way.” Id. at 1826. And “[t]he inclusion of a brief, ceremonial prayer as part of a larger exercise in civic recognition,” the plurality explained, “suggests that its purpose and effect are to acknowledge religious leaders and the institutions they represent.” Id. at 1827.
Thus the historical “practice of prayer,” at least as described by the Supreme Court, is not entirely “similar to that now challenged.” Marsh, 463 U.S. at 791, 103 S.Ct. 3330. In Rowan County, the commissioners themselves, not guest ministers, led the community in prayer, and they composed each invocation “according to their personal faiths.” Lund, 103 F.Supp.3d at 724; see J.A. 276-94 (affidavits of the commissioners). Relative to Town of Greece, the county’s prayer practice featured “much greater and more intimate government involvement.” Lund, 103 F.Supp.3d at 723. The conspicuous absence of case law on lawmaker-led prayer is likely no accident. As elaborated below, this type of prayer both identifies the government with religion more strongly than ordinary invocations and heightens the constitutional risks posed by requests to participate and by sectarian prayers.
This is especially true where legislators are the only eligible prayer-givers. Both Town of Greece and Marsh involved open, inclusive prayer opportunities. In the former case, the town “at no point excluded or denied an opportunity to a would-be prayer giver,” and town leaders affirmed that “a minister or layperson of any persuasion, including an atheist, could give the invocation.” Town of Greece, 134 S.Ct. at 1816. Marsh emphasized that the ordinary chaplain “was not the only clergyman heard by the Legislature; guest chaplains .., officiated at the request of various legislators and as substitutes during [the regular chaplain’s] absences.” Marsh, 463 U.S. at 793, 103 S.Ct. 3330. The openness evinced by these other elected bodies contrasts starkly with Rowan County’s policy of restricting the prayer opportunity to the commissioners alone.
Marsh and Town of Greece, while supportive of legislative prayer, were measured and balanced decisions. See 134 S.Ct. at 1824-26 (describing the proper inquiry as “fact-sensitive” and the analysis as “an inquiry into the prayer opportunity as a whole”). The dissents in this case, by contrast, are wholly bereft of any sense of balance. Any balanced assessment of Marsh and Toum of Greece makes clear the dissents’ lack of fidelity to those decisions. The dissents’ reading of Town of Greece is faithful only to what the dissents wish that opinion would say, not to what it actually said. As Town of Greece makes plain, the Court has never approved anything like what has transpired here or anything resembling the dissents’ invitation to local government to work sectarian practices into public meetings in whatever manner it wishes. Id. at 1826. Rather Town of Greece told the inferior federal courts to do exactly what the majority has *279 done here—that is to grant local governments leeway in designing a prayer practice that brings the values of religious solemnity and higher meaning to public meetings, but at the same time to recognize that there remain situations that in their totality exceed what Town of Greece identified as permissible bounds. It is the dissents’ unwillingness to identify any meaningful limit to any sort of sectarian prayer practice in local governmental functions that draws their fidelity to Town of Greece into serious question.
C.
The county, bolstered by amici, argues that there is “a long tradition of opening legislative sessions—at all levels of government—with prayer by legislators themselves.” Supp. Br. of Appellant at 3. Members of Congress have occasionally delivered invocations in the Senate and House of Representatives. See Br. of Amici Curiae Members of Congress at 6. The state amici, drawing on a national survey, assert that a majority of state legislatures allow lawmakers to offer invocations “on at least some occasions,” including seven of the ten state legislative chambers in the Fourth Circuit. Br. of Amici Curiae State of West Virginia and 12 Other States at 13-14. Many county and city governments also permit elected officials to deliver invocations. Id. at 15. Setting aside the question of whether contemporaneous practices provide compelling evidence of historical tradition, it is clear that lawmaker-led prayer is far from rare.
The evidence collected by Rowan County and amici, however, only reinforces our conclusion that the county’s prayer practice falls outside the tradition of legislative prayer elaborated in Marsh and Town of Greece. First, while lawmakers may occasionally lead an invocation, this phenomenon appears to be the exception to the rule, at least at the state and federal levels. Amici members of Congress note that “Senators have, from time to time, delivered the prayer,” but that “[mjembers routinely invite guest ministers” to offer the invocation. Br. of Amici Curiae Members of Congress at 6-7 (citations omitted). The survey cited by the state amici clarifies that “it is a tradition for a chaplain to be selected to serve the [legislative] body.” National Conference of State Legislatures, Inside the Legislative Process 5-147 (2002) (hereinafter NCSL Survey). Twenty-seven state legislative chambers designate an official chaplain. Id. Seventy-nine invite “visiting chaplains [who] usually rotate among religions.” Id. Second, Rowan County and amici elide the distinction between extending the prayer opportunity to lawmakers (as many legislatures do) and restricting it to those lawmakers (as Rowan County did here). For the reasons we discuss below, the latter approach poses greater risks under the Establishment Clause.
In marshaling the historical and contemporaneous evidence of lawmaker-led prayer, Rowan County and its amici are waging war against a phantom. The plaintiffs have never contended that the Establishment Clause prohibits legislators from giving invocations, nor did the district court so conclude. See Lund, 103 F.Supp.3d at 722 n.4 (“[T]he Commissioners’ provision of prayers is not per se unconstitutional.... Under a different, inclusive prayer practice, Commissioners might be able to provide prayers.... ”). Like the plaintiffs and the district court, we “would not for a moment cast all legislator-led prayer as constitutionally suspect.” Lund, 837 F.3d at 433 (panel dissent). Religious faith is “a source of personal guidance, strength, and comfort.” Id. at 431. And legislative prayer’s “solemnizing effect for lawmakers is likely heightened when they personally utter the prayer.” Id. at 433. Accordingly, *280 the Establishment Clause indeed allows lawmakers to deliver invocations in appropriate circumstances. Legislator-led prayer is not inherently unconstitutional.
We simply’conclude, as the district court did, that the identity of the prayer-giver is relevant to the constitutional inquiry. Establishment Clause questions are by their nature “matter[s] of degree,” presupposing some acceptable practices and others that cross the line. Van Orden v. Perry, 545 U.S. 677, 704, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (Breyer, J., concurring in the judgment); see also Lynch, 465 U.S. at 678-79, 104 S.Ct. 1355 (“In each case, the inquiry calls for line drawing; no fixed, per se rule can be framed..,. The line between permissible relationships and those barred by the [Establishment] Clause can no more be straight and unwavering than due process can be defined in- a single stroke or phrase or test”). Prayers ted by lawmakers, like sectarian prayers, may violate the Establishment' Clause in some circumstances. And just as sectarian prayer has its limits, so, too, does legislator-led prayer.
Within the universe of prayers delivered by legislators, the constitutionality of a particular government’s approach ultimately will depend on other aspects of the prayer practice. In'fact, the very survey proffered by state amici illustrates the importance of viewing lawmaker-led prayer in context. The survey recommends that the prayer-giver “be especially sensitive to éxpressions that may be unsuitable to members of some faiths” when “opening and closing the prayer.” NCSL Survey at 5-146. Because legislator-led invocations vary so widely, “[w]e cannot discern from the general survey proffered by amici which prayers were primarily for the benefit of legislators or commissioners as in Town of Greece and which focused, as the prayers did here, on requesting the citizens at the meeting to pray.” Lund, 837 F.3d at 433 (panel dissent). “Nor do we know from the survey what percentage of prayers given by elected officials generally contain sectarian references or proselytizing exhortations, or which are non-denominational or delivered by legislators of diverse faiths.” Id.
In sum, the elected members of Rowan County’s Board of Commissioners composed and delivered their own sectarian prayers featuring but a single faith. They prevented anyone else from offering invocations. The Board’s prayer practice thus pushes this case well outside the confines of Town of Greece and indeed outside the realm of lawmaker-led prayer itself. To see just how far outside those boundaries the prayer practice was, we must turn to the operation of the practice, itself. Because Town of Greece does not resolve this challenge, we must decide whether the county’s prayer practice, taken as a whole, exceeded constitutional limits on legislative prayer.
III.
“[W]hen a seat of government,begins to resemble a house of. worship, the values of religious observance are put at risk, and the danger of religious division rises accordingly.” Lund, 837 F.3d at 431 (panel dissent). That is why “[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.” Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). Rowan County’s prayer practice violated this maxim by so clearly identifying the government with a particular faith.
Courts adjudicating a challenge to legislative prayer inquire “into the prayer opportunity as a whole, rather than into the contents of a single prayer.” Town of *281 Greece, 134 S.Ct. at 1824. They must conduct a “fact-sensitive” review of “the setting in which the prayer arises and the audience to whom it ,is directed,” id. at 1825 (plurality opinion), as well as “the pattern of prayers over time,” id. at 1827.
As the exclusive prayer-givers, Rowan County’s elected representatives— the very embodiment of the state—delivered sectarian invocations referencing one and only one religion. They asked them constituents to join them in worship. They did so at every meeting of a local governing body for many years. We examine each of these features in turn: commissioners as the sole prayer-givers; invocations that drew exclusively on Christianity and sometimes served to advance that faith; .invitations to attendees to participate; and the local government setting.
To respect the Supreme Court’s insistence on a fact-sensitive inquiry, we must also pay close attention to the interplay between the various facets of the county’s prayer practice. As previously noted, the invocations here were written and given by elected representatives acting in their official capacity. This fact interacts with the other aspects of the county’s practice, altering their constitutional significance. Accordingly, we must evaluate these other elements through the lens of the prayer-giver’s identity. We conclude that it is the combination of these elements—not any particular feature alone—that “threatens to blur the line between' church and state to a degree unimaginable in Town of Greece.” Lund, 837 F.3d at 435 (panel dissent).
A.
“It is a cornerstone principle of our Establishment Clause jurisprudence that ‘it is no part of the business of government to compose official prayers Lee, 505 U.S. at 588, 112 S.Ct. 2649 (quoting Engel v. Vítale, 370 U.S. 421, 425, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962)). The government “is without power to prescribe ... any particular form of prayer which is to be used as an official prayer in carrying on any program of governmentally sponsored religious activity,” Engel, 370 U.S. at 430, 82 S.Ct. 1261. The Court reiterated this foundational point in Town of Greece: “Our Government is prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief .or code of moral behavior.” 134 S.Ct. at 1822.
But that is precisely what happened in Rowan County, where the five commissioners “maintainfed] exclusive and complete control over the content of the prayers.” Lund, 103 F.Supp.3d at 733. In Marsh, the prayer-giver was paid by the state. In Toum of Greece, the prayer-giver was invited by the state. But in Rowan County, the prayer-giver was the state itself. The Board was thus “elbow-deep in the activities banned by the Establishment Clause—selecting and prescribing sectarian prayers.” Lund, 837 F.3d at 434 (panel dissent).
By arrogating the prayer opportunity to itself, the Board also restricted the number of faiths that could be referenced at its meetings. When guests are allowed to deliver invocations, as in Marsh and Town of Greece, legislators can easily expand the religions represented (perhaps in response to requests or on their own initiative). In upholding sectarian prayer, Town of Greece emphasized that legislatures are typically able and willing to accommodate diverse faiths. The way to acknowledge “our growing diversity,” the Court suggested, is “not. by proscribing sectarian content, but by welcoming ministers of many creeds.” Town of Greece, 134 S.Ct. at 1820-21 (citing congressional prayers, ref *282 erencing Buddhism, Hinduism, Islam, and Judaism).
Compare the county’s rigid, restrictive practice with the more flexible, inclusive approach upheld in Town of Greece. Greece welcomed adherents of all faiths, allowing “any member of the public [the chance] to offer an invocation reflecting his or her own convictions.” Id. at 1826 (plurality opinion). Most of the guest ministers were Christian, owing to the fact that “nearly all of the congregations in town turned out to be Christian.” Id. at 1824 (majority opinion). To address complaints, however, the town “invited a Jewish layman and the chairman of the local Baha’i temple to deliver prayers” and granted a Wiccan priestess’s request to participate. Id. at 1817. By opening its prayer opportunity to all comers, the town cultivated an atmosphere of greater tolerance and inclusion.
Rowan County regrettably sent the opposite message. Instead of embracing religious pluralism and the possibility of a correspondingly diverse invocation practice, Rowan County’s commissioners created a “closed-universe” of prayer-givers dependent solely on election outcomes. Lund, 103 F.Supp.3d at 723. The commissioners effectively insulated themselves from requests to diversify prayer content. And we cannot overlook the fact that the decision to restrict the prayer opportunity to the commissioners was not made by the citizens of Rowan County or some disinterested group but perpetuated by the commissioners themselves—all of whom identify as Protestant Christian. See J.A. 275 (United Methodist); J.A. 287 (same); J.A. 279 (Independent Baptist); J.A. 291 (same); J.A. 283 (Southern Baptist).
For any Buddhists, Hindus, Jews, Muslims, Sikhs, or others who sought some modest place for their own faith or at least some less insistent invocation of the majority faith, the only recourse available was to elect a commissioner with similar religious views. See Br. of Appellant at 26. We find this point troubling. “[V]oters may wonder what kind of prayer a candidate of a minority religious persuasion would select if elected. Failure to pray in the name of the prevailing faith risks becoming a campaign issue or a tacit political debit, which in turn deters those of minority faiths from seeking office.” Lund, 837 F.3d at 435 (panel dissent). Further, allowing the county to restrict to one the number of faiths represented at Board meetings would warp our inclusive tradition of legislative prayer into a zero-sum game of competing religious factions. Our Constitution safeguards religious pluralism; it does not sanction activity which would take us “one step closer to a de facto religious litmus test for public office.” Id.
Finally, we note that the risk of political division stemming from prayer practice conflict is no mere abstract matter. At one meeting, an individual who “expressed opposition to the Board’s prayer practice” was booed and jeered by the audience. Lund, 103 F.Supp.3d at 729. In addition, the prayer practice became a campaign issue in the 2016 Board elections. The two incumbent commissioners favored continuing the county’s defense of the prayer practice, while two challengers opposed it. See Supp. Br. of Appellees at 16 n.6. The incumbents ultimately prevailed. Id. Almost four decades ago, the Supreme Court cautioned that “political division along religious lines ... is a threat to the normal political process,” and is therefore “one of the principal evils against which the First Amendment was intended to protect.” Lemon, 403 U.S. at 622, 91 S.Ct. 2105. Time has done nothing to dimmish the salience of this warning.
B.
Having structured the prayer opportunity so that Board members alone could give *283 voice to their religious convictions, the commissioners unceasingly and exclusively invoked Christianity. Even more problematic, the prayer practice at times “promote[d]” Christianity, the commissioners’ “preferred system of belief.” Town of Greece, 134 S.Ct. at 1822.
Rowan County makes the entirely fair point that courts must not become censors of public prayer. The Supreme Court echoed this concern, warning courts away from becoming “supervisors and censors of religious speech.” Id. A single prayer will thus not “despoil a practice that on the whole reflects and embraces our tradition” of legislative prayer. Id. at 1824. At the same time, however, courts must decide the case before them, which cannot be done without “reviewing] the pattern of prayers over time.” Id. at 1826-27 (plurality opinion). Where even the most cursory look reveals a constitutionally problematic prayer practice, courts have no choice but to examine the entire record, which of course includes the invocations. A proper sensitivity toward the dangers of judicial overreach in this area cannot divest us of a duty which if not performed would grant free rein to governmental sectarian abuse.
The lead dissent decries this inquiry as “judicial review run amok.”[3] Infra Lead Dissent at 318. But while judicial review of prayer practices might indeed pose a danger in some instances, there is no danger here. Every single individual in Rowan County remains free to pray as he or she sees fit and in the individual or collective setting that he or she finds most meaningful. What government is not free to do, however, is link itself persistently and relentlessly to a single faith. See Larson, 456 U.S. at 244, 102 S.Ct. 1673 (“The clearest command of the Establishment Clause is that one religious denomination cannot be. officially preferred over another.”). This evident an identification of the state with one and only one faith is not, we repeat, some marginal or peripheral constitutional violation that we can just shrug off and wish away. For to do so here would wish away the Establishment Clause itself. The overwhelming majority of the Board’s invocations referenced tenets of Christianity. Over a period of more than five years, only 4 of 143 prayers were non-sectarian. Lund, 103 F.Supp.3d at 714. The remaining 139 prayers, or 97%, “use[d] ideas or images identified with [Christianity],” Lee, 505 U.S. at 588, 112 S.Ct. 2649, such as “Jesus,” “Christ,” or the “Savior,” Lund, 103 F.Supp.3d at 714. No other religion was ever represented in the' invocations. Id. Sectarian references were especially common at the conclusion of the prayer. To list but a few representative examples: “I ask this in the name of the King of Kings, the Lord of Lords, Jesus Christ,” S.A. 33 (prayer of March 5, 2012); “[I] ask these things in the name of Jesus and for the sake of His Kingdom,” S.A. 15 (prayer of June 2, 2008); “For the sake of your Son, our Savior, the Lord Jesus Christ,” S.A. 31 (prayer of October 3, 2011); and “In Jesus’ name we pray,” S.A. 22 (prayer of November 16, 2009). Several invocations delved into the finer points of Christian theology. One prayer during the holiday season began, “[W]e’d like to thank you for the Virgin Birth, we’d like to thank you for the .Cross at Calvary, and we’d like to thank you for the resurrection.” S.A. 12 (prayer of December 3, 2007). Another remarked, “Father God, ... [w]e thank you so much for sending your Son Jesus Christ to this world, and we always remember that this time of year, Lord, and we should remember it always.” S.A. 27 (prayer of December 6, 2010).
Town of Greece instructs courts to consider a prayer practice from the perspec *284 tive of.the “reasonable observer,” who is presumed to be “acquainted with [the] tradition” of legislative prayer. 134 S.Ct. at 1825 (plurality opinion). Although “adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith,” id. at 1823 (majority opinion), the “reasonable observer”—or even the exceptionally well-informed citizen steeped in the Court’s legislative prayer jurisprudence—would be surprised to find exclusively sectarian invocations béing delivered exclusively by the commissioners because, as noted, the Court has consistently spoken in terms of guest ministers and outside volunteers.
In addition, as noted, no religion other than Christianity was ever represented at Board meetings. “When the state’s representatives so emphatically evoke a single religion in nearly every prayer over a period of many years, that faith comes to be perceived as the one true faith, not merely of individual prayer-givers, but of government itself.” Lund, 837 F.3d at 434 (panel dissent). Faced with this unchanging tableau, attendees must have come to the inescapable conclusion that the Board “favors one faith and one faith only.” Id. at 435. This was the inference drawn by the plaintiffs, who described their sense of separation from their own government and the political process itself. See S.A. 1-10 (affidavits of the plaintiffs).
It is not necessary, of course, for governments to go out of their way “to achieve religious balancing” in prayer content or to represent some minimum number of faiths. Town of Greece, 134 S.Ct. at 1824. But in considering whether government has aligned itself with a particular religion, a tapestry of many faiths lessens that risk whereas invoking only one exacerbates it. Here, the Board’s practice created the perception that Rowan County had taken sides on questions of faith.
Not only did the Board’s invocations convey its singular approval of Christianity, the prayer opportunity on occasion served to advance that faith. The tradition of legislative prayer elaborated in Town of Greece was composed of prayers that “reflect upon shared ideals and common ends” and that “strive for the idea that people of many faiths may be united in a community of tolerance and devotion,” using sectarian “religious themes [as] particular means to [these] universal ends.” Id. at 1823. In contrast, the Establishment Clause does not condone a prayer practice that “over time is ... ‘exploited to proselytize or advance any one, or to disparage any other, faith or belief.’ ” Id. (quoting Marsh, 463 U.S. at 794-95, 103 S.Ct. 3330).
On multiple occasions, the invocations crossed the line from “reflecting] upon shared ideals and common ends,” id. at 1823, to “promoting] a preferred system of belief,” id. at 1822. To begin, several prayers purported to confess spiritual shortcomings on the community’s behalf. Consider the following examples:
• “Although you sent Jesus to be Savior of the world, we confess that we treat Him as our own personal God. Although you are one, and the body of Christ is one, we fail to display that unity in our worship, our. mission, and our fellowship.” S.A. 31 (prayer of October 3,2011),
• “Lord, we confess that we have not loved you with all our heart, and mind and strength, and that wé have not loved one another as Christ loves us. We have also neglected to follow the guidance of your Holy Spirit, and have allowed sin to enter into our lives.” S.A. 30 (prayer of August 1, 2011).
*285 • “God of healing mercies, we come to you this day confessing that we are an imperfect people.... We acknowledge that we’ve been given the pathway to peace, in- the witness of Jesus Christ.... [But] oftentimes we have failed to witness on Earth.” S.A. 26 (prayer of August 16, 2010).
By portraying the failure to love Jesus or follow his teachings as spiritual defects, the prayers implicitly “signaled] disfavor toward” non-Christians. Town of Greece, 134 S.Ct. at 1826 (plurality opinion).
Multiple prayers characterized Christianity as “the one and only way to salvation,” S.A. 16 (prayer of August 18, 2008), thus implying that adherents of other faiths were in some ways condemned. For example, one commissioner unequivocally stated that “we do believe that there is only one way to salvation, and that is Jesus Christ.” S.A. 12 (prayer of December 3, 2007); see also S.A. 13 (prayer of February 18, 2008) (“I ask all these things in the name of Jesus, the one . and only way to salvation.”).
The record is replete with other invocations proclaiming that Christianity is exceptional and suggesting that other faiths are inferior. This message risks “denigrat[ing] nonbelievers [and] religious minorities.” Town of Greece, 134 S.Ct. at 1823. Consider the following inexhaustive survey:
• “We have been blessed to be the recipients of your immeasurable grace. We can’t be defeated, we can’t be destroyed, and we can’t be denied because we are going to live forever with you -through the salvation of Jesus Christ.... And as we pick up the Cross, we will proclaim His name above all names, as the only way to eternal life.” S.A. 33 (prayer of March 6, 2012).
• “We can’t be defeated, we can’t be destroyed, and we won’t be denied, because of our salvation through the Lord Jesus Christ.” S.A. 19 (prayer of May 18,2009).
• “You saved us .and you call us with the holy calling. We are the recipients of your immeasurable grace and glory. We are the richest people in the world. [W]e’re going to live forever with Him.” S.A. 16 (prayer of June 2, 2008).
Finally, several prayers urged attendees to embrace Christianity, thereby “preach[ing] conversion.” Town of Greece, 134 S.Ct. at 1823. One invocation advocated that the community take up the Christian faith:
Father, I pray that all may be one as you, Father, are in Jesus, and He in you. I pray that they may be one in you, that the world may believe that you sept Jesus to save us from our sins. May we hunger and thirst for righteousness, be made perfect in holiness, and be preserved, whole and entire,., spirit, soul, and body, irreproachable at the coming of our Lord Jesus Christ.
S.A. 21 (prayer of October 5, 2009), “Holy Spirit,” went another prayer, “open -our hearts to Christ’s teachings, and enable us to spread His message amongst the people we know and love through the applying of the sacred words in our everyday lives.” S.A. 28 (prayer of March 7,2011),
Religious faith has both doctrinal and ecumenical features. The doctrinal aspects of religion, most often expressed in religious services, signify the ideas and rituals that make religions distinctive. Doctrine can lend strength, cohesion, comfort, and spiritual depth to religious communities. The ecumenical aspects of faith, by contrast, draw on the beliefs shared by many different creeds and “widely held among the people of this country.” Marsh, 463 *286 U.S. at 792, 103 S.Ct. 3330. Central among these beliefs is faith in a higher providence that lends meaning and purpose to our life on earth and encourages us to embrace our common humanity and to strive for the best versions of ourselves. At its best, legislative prayer gives voice to the ecumenical dimensions of religious faith. Invocations that, like the above examples, hone too sharply in on doctrinal distinctions, risk “the divisiveness the Establishment Clause seeks rightly to avoid.” Simpson, 404 F.3d at 284. Prayer that would be welcome and moving to the faithful in so many a setting ought to in some way become welcoming to others where the powers of government are implicated and persons of diverse faiths are involved.
Two serious harms arise “[w]hen the power [and] prestige ... of government is placed behind a particular religious belief.” Engel, 370 U.S. at 431, 82 S.Ct. 1261. One is suffered by the individual. “A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed.” Lee, 505 U.S. at 592, 112 S.Ct. 2649; see Engel, 370 U.S. at 429, 82 S.Ct. 1261 (“[O]ne of the greatest dangers to the freedom of the individual to worship in his own way lay[s] in the Government’s placing its official stamp of approval upon one particular kind of prayer... .”). The second injury is to the government itself. A well-founded perception that a government favors citizens subscribing to a particular faith would undermine the democratic legitimacy of its actions. See Engel, 370 U.S. at 431, 82 S.Ct. 1261 (“[W]henever government had allied itself with one particular form of religion, the inevitable result had been that it had incurred the hatred, disrespect and even contempt of those who held contrary beliefs.”).
By proclaiming the spiritual and moral supremacy of Christianity, characterizing the political community as a Christian one, and urging adherents of other religions to embrace Christianity as the sole path to salvation, the Board in its prayer practice stepped over the line. Concerns of this nature underlay Justice Jackson’s enduring distillation of First Amendment values: “If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion..., ” W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). This is no less true when orthodoxy reflects, as it did here, the most sincere manifestations of the most deeply held convictions.
C.
Before delivering their invocations, the commissioners told attendees to rise and often invited them to pray. See, e.g., S.A. 12 (prayer of November 19, 2007) (“Let’s pray together.”); S.A. 26 (prayer of October 4, 2010) (“Please pray with me.”); S.A. 37 (prayer of February 19, 2013) (“Let us pray.”). Through these requests and the proselytizing invocations just discussed, the Board members “press[ed] religious observances upon their citizens.” Van Orden, 545 U.S. at 683, 125 S.Ct. 2854.
Justice Kennedy’s plurality opinion in Town of Greece advises courts to assess whether the “principal audience” for the invocations is the lawmakers or the public. 134 S.Ct. at 1825. An internally-focused prayer practice “accommodate[s] the spiritual needs of lawmakers,” id. at 1826, while an externally-oriented one attempts “to promote religious observance among the public,” id. at 1825.
The invitations here fall “within the realm of soliciting, asking, requesting, or *287 directing ... of concern to the Town of Greece plurality.” Lund, 103 F.Supp.3d at 728. The lead dissent insists that the Rowan County “legislators themselves [were] the intended ‘congregation’ for legislative prayer.” Infra Lead Dissent at 312. But the record makes clear that the commissioners were seeking audience involvement, not merely addressing fellow legislators. Indeed, it is difficult to imagine more probative evidence of a government’s concern for the community’s religiosity than a legislator’s request that citizens join him in prayers that, for instance, ask “the world [to] believe that [God] sent Jesus to save us from our sins.” S.A. 21 (prayer of October 5, 2009). Because the invocations here placed Christianity on a higher plane than other faiths and urged attendees to embrace that religion, the requests to participate in those prayers are clear indicators of an effort “to promote religious observance among the public.” Town of Greece, 134 S.Ct. at 1825 (plurality opinion).
Town of Greece involved similar requests, but the prayers in that case did not approach the degree of proselytization here and—even more important—the invitations “came not from town leaders but from the guest ministers, who presumably are accustomed to directing their congregations in this way.” Id. at 1826. Justice Kennedy underscored that “[although board members themselves stood [or] bowed their heads,” they “at no point solicited similar gestures by the public.” Id.
From the perspective of the reasonable observer, this distinction matters. Such an observer is aware that phrases like “Let us pray” may be “for many clergy ... almost reflexive.” Id. at 1832 (Alito, J., concurring). But when these words are uttered by elected representatives acting in their official capacity, they become a request on behalf of the state. The invitations suggest that the lawmaker conceives of the political community as comprised of people who pray as he or she does.
The Town of Greece plurality expressly cautioned that “[t]he analysis would be different if town board members directed the public to participate in the prayers.” Id. at 1826 (emphasis added). Yet Rowan County would have us approve such requests regardless of their source. See Supp. Br. of Appellant at 7 (“The Supreme Court saw no conflict between these introductions and the Establishment Clause.”). Accepting this argument would require us to blind ourselves to the very fact that the Town of Greece plurality regarded as relevant and perhaps even dispositive. In the end, the record speaks for itself: elected officials exhorted their constituents to participate in sectarian—and sometimes even proselytizing—religious exercises.
D.
Justice Kennedy’s plurality opinion in Town of Greece instructs courts to consider “the setting in which the prayer arises.” 134 S.Ct. at 1825. The prayers here were delivered at the public meetings of a local government body, a fact that makes the other aspects of the county’s prayer practice even more questionable.
Relative to sessions of Congress and state legislatures, the intimate setting of a municipal board meeting presents a heightened potential for coercion. Local governments possess the power to directly influence both individual and community interests. As a result, citizens attend meetings to petition for valuable rights and benefits, to advocate on behalf of cherished causes, and to keep tabs on their elected representatives—in short, to participate in democracy. The decision to attend local government meetings may not be wholly voluntary in the same way as the choice to participate in other civic or community functions. Going to one’s seat of govern *288 ment and going to one’s place of worship are “very different forms of attendance.” Lund, 837 F.3d at 437 (panel dissent).
In addition, the commissioners. considered citizen petitions shortly after the invocation. Like other local governments, the Board exercises both legislative authority over, questions of general public importance as well as a quasi-adjudicatory power over such granular .issues as zoning petitions, permit applications, and contract awards. In Town of Greece, the board apparently bifurcated its meetings into legislative and adjudicative portions. See 134 S.Ct. at 1829 (Alito, J., concurring). As Justice Alito explained in his concurrence, the prayer “preceded only the portion of the town board meeting that [was] essentially legislative.” Id. Accordingly, the case did not “involve the constitutionality of a prayer prior to what may be characterized as an adjudicatory proceeding.” Id.
In- the parlance of Justice Alito’s concurrence, Rowan County’s Board intermingled its legislative and adjudicative business. On numerous occasions, adjudicatory proceedings were the first items up for consideration after the standard opening protocols. See, e.g., J.A. 27 (agenda of November 5, 2007) (“Quasi-Judicial Public Hearing for PCUR 02-07 for Request by Nelson Lingle”); J.A. 105 (agenda of August 17, 2009) (“Quasi-Judicial Hearing for CUP 01-09 for Albert Ray Kepley”); J.A. 163 (agenda of February 21, 2011) (“Quasi-Judicial Hearing for SUP 01-11”),
The “close proximity” between a board’s sectarian exercises and its consideration of specific individual petitions “presents, to say the least, the opportunity for abuse.” Lund, 837 F.3d at 436 (panel dissent). The plurality in Town of Greece recognized, as much in advising courts to consider whether “town, board members directed the public, to participate in the prayers.” 134 S.Ct. at 1826. This is not to suggest that the commissioners made decisions based on whether an attendee participated in the prayers.- But the fact remains that the Board considered individual petitions on the heels of the commissioners’ prayers.,
Finally, - the intimacy of a town board meeting may push attendees to participate in the prayer practice in order to avoid the community’s disapproval. This is especially true where, as here, the government has aligned itself with the faith that dominates the electorate. Rowan County’s commissioners always stood up and bowed their heads, as did . most of the audience, Due to the Board’s requests, the plaintiffs also felt compelled to stand so that they would not stand out. And as we noted, .one person who spoke out against the Board’s prayer practice was booed and jeered by her fellow citizens.
To be sure, citizens could time their arrival at the meeting to come after the prayer, leave the room before the prayer, or simply stay seated. But these options, such as they were, served only to marginalize. It is simply wrong to attribute discomfort with the situation here to hypersensitivity. Plaintiffs were placed in a situation that required them to decide “between staying seated and unobservant, or acquiescing to the prayer practice.” Lund, 103 F.Supp.3d at 732. What was forced upon plaintiffs at these meetings was “no trivial chojce, involving, as it does, the pressures of civic life and the intimate precincts of the spirit.” Lund, 837 F.3d at 437 (panel dissent).
There remains the question of what prayer practice in Rowan County would be a permissible one. We decline, however, to select one from among the various options available to defendant. Any future course of action is, and certainly would be in the first instance, for Rowan County to decide. The problematic features of the present practice noted in our decision should pro *289 vide substantial guidance for whatever future steps the county may wish to take. The ultimate criterion is simply one of conveying a message of respect and welcome for persons of all beliefs and adopting a prayer practice that advances “the core idea behind legislative prayer, ‘that people of many faiths may be united in a community of tolerance and devotion.’ ” Id. at 438 (quoting Town of Greece, 134 S.Ct. at 1823).
IV.
We finally find unavailing the two primary arguments advanced in Rowan County’s favor. To begin, the county urges this court to conduct a blinkered review of its prayer practice. The county first reduces the practice to its constituent elements, then finds that each element is not dispositive, and finally concludes that each element' is therefore immaterial. See, e.g., Supp. Br. of Appellant at 9 (“[F]our rights do not make a wrong.... [E]ach feature enumerated by plaintiffs is common to prayer practices observed in [other] legislatures .... ”).
But when a court looks to the totality of the circumstances to assess the constitutionality of a prayer practice, as the Supreme Court says we must, a fact may be relevant to the court’s inquiry while not outcome-determinative. And by dissecting the prayer practice and subjecting each piece to an independent constitutional evaluation, the county’s approach overlooks the crucial interaction between the elements. This mode of analysis simply fails to heed the Supreme Court’s instruction that we examine, “the prayer opportunity as a whole.” Town of Greece, 134 S.Ct. at 1824.
The dissents do not even begin to consider the prayer practice here holistically. They address it piece by piece by piece. Unsurprisingly, they, find each piece “standing alone [is] undoubtedly, constitutional.” Infra Lead Dissent at 306. Be that as it may, the citizens of Rowan County are not experiencing the prayer practice piece by piece by piece. It comes at them Whole. It would seem elementary that a thing may be innocuous in isolation and impermissible in combination. In fact, the lead dissent’s tired “divide and conquer” strategy has been frowned upon by the Supreme Court itself. See, e.g., United States v. Arvizu, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (“The court’s evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the ‘totality of the circumstances,’ as our cases have understood that phrase.'... [Precedent] precludes this sort of divide-and-conquer analysis.”).
Second, we cannot discern any meaningful distinction between the commissioners and the Board. The lead dissent argues that “[t]here is no evidence that the Board, as a Board, had any role in any of the prayers given by any of the individual commissioners,” who are “free agent[s] no different from 'the ministers in Town of Greece or the paid chaplain in Marsh.” Infra Lead Dissent at 312. On this view, “it is only through [the] act of the deliberative body writing or editing religious speech that government would impermissibly seek ‘to promote a preferred system of belief or code of moral behavior’ with selected content.” Lund, 837 F.3d at 421. (quoting Town of Greece, 134 S.Ct. at 1822). This reasoning proves too much. Such an approach would create a constitutional safe harbor for all prayers delivered by legislators “no matter how proselytizing, disparaging of other faiths, or coercive” so long as the legislature itself did not collectively compose the prayers. Supp. Br. of Appellees at 13-14 n.5.
Further, the attempted distinction between the members of the Board and the *290 Board itself rests on a formalism that cannot withstand scrutiny. When one of Rowan County’s commissioners leads his constituents in prayer, he is not just another private citizen. He is the representative of the state, and he gives the invocation in his official capacity as a commissioner. His power to offer a prayer derives from this status; were he not a member of the Board, he would be barred from doing so. The commissioners themselves recognized as much. Invoking a recurrent theme in the prayer practice, one Board member observed: “[W]e’re not here representing ourselves. Lord, we represent you and we represent the taxpayers of Rowan County.” S.A. 16 (prayer of October 6, 2008). And unlike a guest minister, the commissioner remains on the scene to participate in the Board’s decision-making. Finally, “it is hard to believe that a practice observed so uniformly over so many years was not by any practical yardstick reflective of board policy.” Lund, 837 F.3d at 434 (panel dissent). In the context of Rowan County’s prayer practice, there is no daylight between the individual commissioners and the Board of Commissioners.
V.
The principle at stake here may be a profound one, but it is also simple. The Establishment Clause does not permit a seat of government to wrap itself in a single faith. But here elected officials took up a ministerial function and led the political community in prayers that communicated exclusivity, leaving members of minority faiths unwilling participants or discomforted observers to the sectarian exercises of a religion to which they did not subscribe. The solemn invocation of a single faith in so many meetings over so many years distanced adherents of other faiths from that representative government which affects the lives of all citizens and which Americans of every spiritual persuasion have every right to call their own.
If the prayer practice here were to pass constitutional muster, we would be hard-pressed to identify any constitutional limitations on legislative prayer. In arguing that the Establishment Clause would still retain vitality, the lead dissent writes that the Board members would still not be permitted to offer “prayers that implored the audience to attend a particular church” or to issue “official decisions based on whether a member of the public participated in, or voiced opposition to, the legislative prayer practice.” Infra Lead Dissent at 318. Well of course such things would be wholly out of bounds. In setting such criteria however, the dissent unwittingly reveals it recognizes few realistic limits on public sectarian practice at all.
We recognize that dissents by their nature attempt to broaden majority opinions and portray them as doomsday propositions. But these dissents go well beyond even that. The lead dissent writes that the majority restricts all lawmakers to “only a generic prayer to a generic god.” Infra Lead Dissent at 323. That assertion is incorrect. Any reading of the majority opinion reveals it as a straw man. This case involves one specific practice in one specific setting with one specific history and one specific confluence of circumstances. To extract global significance from such specificity is beyond a stretch.
In concluding that Rowan County’s prayer practice is constitutionally infirm, we reiterate that legislator-led prayer can operate meaningfully within constitutional bounds. And “[n]othing about the constitutional drawbacks of Rowan County’s prayer practice should be construed as disparaging the prayers themselves, which were moving and beautiful on many levels.” Lund, 837 F.3d at 436 (panel dissent). But *291 ruling in the county’s favor would send us down a rancorous road. It would bear “unfortunate consequences for American pluralism, for a nation whose very penny envisions one out of many, a nation whose surpassing orthodoxy belongs in its constitutional respect for all beliefs and faiths, a nation which enshrined in the First and Fourteenth Amendments the conviction that diversity in all of its dimensions is our abiding strength.” Id. at 432.
A final word as to our two friends and valued colleagues in dissent. Judge Niemeyer’s dissent seeks to characterize the majority opinion as anti-religious. See infra Niemeyer Dissent at 296 (“[T]he majority opinion’s reasoning strikes at the very trunk of religion.... ”); id. at 296 (“The majority’s most basic error is its underlying assumption that the Establishment Clause is an anti-religion clause....”). This suggestion may be easily dismissed. To reject the establishment of a single religious faith by the state is not to reject religion itself. See Engel v. Vitale, 370 U.S. 421, 435, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (“It is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance.”). The Founders were able to distinguish between the importance of religion (the Free Exercise Clause) and the establishment of religion in a way that Judge Niemeyer refuses to do.[4]
The lead dissent, meanwhile, disparages the majority for its belief in an “ecumenical utopia” and its respect for the pluralistic nature of religious faith in our country. See infra Lead Dissent at 317. If that be our sin, we shall gladly confess it. Localities enjoy wide discretion in designing a prayer practice, but those that do aspire to an ecumenical and pluralistic prayer opportunity should not have to suffer the scarcely concealed aspersions of “ecumenical utopias” and “generic gods” that some may cast upon them. In its eager acceptance of state-entwined religious orthodoxy, the lead dissent evokes an America that is not ours and never has been. It was in simple recognition of religious pluralism that the Founders adopted the Establishment Clause. See James Madison, Speech at the Virginia Ratifying Convention (June 12, 1788), in 11 The Papers of James Madison 130 (Robert Rutland et al. eds., 1977) (“[The] freedom [of religion] arises from that multiplicity of sects, which pervades America, and which is the best and only security for religious liberty in any society.”). Had America been a monolithic religious entity, there would have been no need for the protection of religious diversity at all. Any thought that ecumenism and respect for religious pluralism would become disfavored in judicial quarters would have left the Founders saddened at what their First Amendment had become.
Our Constitution seeks to preserve religious liberty without courting religious animosity. In this quest, our two religion clauses have been a great success, helping to spare Americans the depth of religious strife that so many societies have had to suffer and endure. And yet free religious exercise can only remain free if not influenced and directed by the hand of the state. On this score, the county simply went too far. The First Amendment in the end is not either/or, but both/and. Believing that free religious exercise in Rowan *292 County may likewise further the values of religious welcome and inclusion, we affirm the judgment of the district court.

AFFIRMED

. "J.A." refers to the Joint Appendix; "S.A,” refers to the Supplemental Appendix.

. The term "legislative prayer” refers to offering an invocation to open government meetings, while "lawmaker-led prayer” or "legislator-led prayer” denotes a subset of invocations delivered by members of the legislative body.

. The lead dissent refers to Judge Agee’s dissent.

. We do note that our colleague has flatly mischaracterized the majority opinion. Nowhere does it say or hold that “Rowan County’s prayer practice [is] unconstitutional, essentially because the prayers were sectarian.” Infra Niemeyer Dissent at 296.