PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 18-2974 & 18-3167

———————

BRIAN FIELDS; PAUL TUCKER; DEANA WEAVER;
SCOTT RHOADES; JOSHUA E. NEIDERHISER;
PENNSYLVANIA NONBELIEVERS, INC.;
DILLSBURG AREA FREETHINKERS;
LANCASTER FREETHOUGHT SOCIETY;
REV. DR. NEAL JONES; PHILADELPHIA ETHICAL
SOCIETY; RICHARD KINIRY

BRIAN FIELDS; PAUL TUCKER;
DEANA WEAVER; SCOTT
RHOADES;
JOSHUA E. NEIDERHISER;
PENNSYLVANIA
NONBELIEVERS, INC.;
DILLSBURG AREA
FREETHINKERS; LANCASTER
FREETHOUGHT SOCIETY;
REV. DR. NEAL JONES;
PHILADELPHIA ETHICAL
SOCIETY

Appellants (18-3167)

v.

SPEAKER OF THE PENNSYLVANIA
HOUSE OF REPRESENTATIVES;
PARLIAMENTARIAN OF THE PENNSYLVANIA
HOUSE OF REPRESENTATIVES;
DIRECTOR OF SPECIAL EVENTS OF THE
PENNSYLVANIA HOUSE OF REPRESENTATIVES;
REPRESENTATIVE FOR PENNSYLVANIA
HOUSE DISTRICT 92;
REPRESENTATIVE FOR PENNSYLVANIA
HOUSE DISTRICT 95;
REPRESENTATIVE FOR PENNSYLVANIA
HOUSE DISTRICT 97;
REPRESENTATIVE FOR PENNSYLVANIA HOUSE
DISTRICT 165;
REPRESENTATIVE FOR PENNSYLVANIA HOUSE
DISTRICT 167;
REPRESENTATIVE FOR PENNSYLVANIA HOUSE
DISTRICT 182;
REPRESENTATIVE FOR PENNSYLVANIA HOUSE
DISTRICT 193;
REPRESENTATIVE FOR PENNSYLVANIA HOUSE
DISTRICT 196,
all solely in their official Capacities

Appellants (18-2974)

---

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 1-16-cv-01764)
District Judge: Honorable Christopher C. Conner

---

Argued June 17, 2019

Before: AMBRO, RESTREPO, and FISHER, <u>Circuit Judges</u>

(Opinion filed:  August 23, 2019)

Jonathan F. Bloom
Karl S. Myers (Argued)
Spencer R. Short
Kyle A. Jacobsen
Stradley Ronon Stevens & Young
2005 Market Street, Suite 2600
Philadelphia, PA  19103

Mark E. Chopko
Stradley Ronon Stevens & Young
1250 Connecticut Avenue NW
Washington, DC  20036

      Counsel for Appellant/Cross Appellee
      Speaker of the Pennsylvania House of Representatives

Patrick Grubel
Richard B. Katskee
Alexander J. Luchenitser (Argued)
Americans United for Separation of Church & State
1310 L Street NW, Suite 200
Washington, DC  20005

Allen C. Warshaw
1035 McCormick Avenue
Mechanicsburg, PA  17055

Eric O. Husby
American Atheists
306 South Blvd
Tampa, FL  33606

       Counsel for Appellee/Cross Appellant
       Brian Fields

Randall L. Wenger
Jeremy L. Samek
Independence Law Center
23 North Front Street
Harrisburg, PA  17101

John J. Bursch
David A. Cortman
Jeremy Tedesco
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC  20001

       Counsel for Amicus Appellants/Cross Appellees
       Mike Kelly, Scott Perry, Lloyd Smucker, Glenn
       Thompson

Steven W. Fitschen
James A. Davids
The National Legal Foundation
2224 Virginia Beach Blvd, Suite 204
Virginia Beach, VA  23454

       Counsel for Amicus Appellants/ Cross Appellee
       Congressional Prayer Caucus

4

Foundation, International
Conference of Evangelical Chaplain
Endorsers, National Legal Foundation,
Veterans in Defense of Liberty

Eric S. Baxter
Chase T. Harrington
Becket Fund for Religious Liberty
1200 New Hampshire Avenue NW, Suite 700
Washington, DC  20036

      Counsel for Proposed Amicus
      Aleph Institute

Gregory E. Ostfeld
Greenberg Traurig
77 West Wacker Drive, Suite 3100
Chicago, IL  60601

Alan Hersh
Greenberg Traurig
300 West 6th Street, Suite 2050
Austin, TX  78701

Vitaliy Kats
Greenberg Traurig
101 East Kennedy Blvd., Suite 1900
Tampa, FL  33602

Gregory M. Lipper
Clinton & Peed
777 6th Street NW, 11th Floor
Washington, DC  20001

Monica L. Miller
American Humanist Association
1821 Jefferson Place NW
Washington, DC 20036

Counsel for Amicus Appellees/ Cross Appellants
Anti-Defamation League, Central Conference of
American Rabbis, Hindu American Foundation,
Interfaith Alliance Foundation, Jewish Social Policy
Action Network, Keshet, Men of Reform Judaism,
National Council of Jewish Women, Asian Pacific
American Advocates, People for the American Way
Foundation, Truah Rabbinic Call for Human Rights,
Union for Reform Judaism, Women of Reform
Judaism, American Humanist Association, Jamie
Raskin, Representative Jared Huffman

Patrick C. Elliott
Colin E. McNamara
Freedom from Religion Foundation
10 North Henry Street
Madison, WI 53703

Counsel for Amicus Appellee
Freedom from Religion Foundation

OPINION OF THE COURT

AMBRO, Circuit Judge

The Pennsylvania House of Representatives begins most legislative sessions with a prayer. The practice has two features that are challenged in this appeal. First, the House invites guest chaplains to offer the prayer, but it excludes nontheists (those who do not espouse belief in a god or gods, though not necessarily atheists) from serving as chaplains on the theory that "prayer" presupposes a higher power. Second, visitors to the House chamber pass a sign asking them to stand for the prayer, and the Speaker of the House requests that audience members "please rise" immediately before the prayer. At least once a House security guard pressured two visitors who refused to stand.

A group of nontheists have challenged the theists-only policy under the Establishment, Free Exercise, Free Speech,[1] and Equal Protection Clauses[2] of our Constitution. As to the Establishment Clause, we uphold the policy because only theistic prayer can satisfy the historical purpose of appealing for divine guidance in lawmaking, the basis for the Supreme

---

[1] The First Amendment states in part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech . . . ." U.S. Const. amend. I. These limits on government action are applied to the states per *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15–16 (1947) (Establishment Clause); *Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940) (Free Exercise Clause); and *Gitlow v. New York*, 268 U.S. 652, 666 (1925) (Free Speech Clause).

[2] "[N]or shall any State . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Court taking as a given that prayer presumes a higher power. For the Free Exercise, Free Speech, and Equal Protection Clauses, we hold that legislative prayer is government speech not open to attack via those channels.

The nontheists also challenge as unconstitutionally coercive the requests to "please rise" for the prayer. We hold that the single incident involving pressure from a security guard is moot. As for the sign outside the House chamber and the Speaker's introductory request that guests "please rise," we hold that these are not coercive.

Thus we affirm in part and reverse in part the ruling of the District Court.

## Background

### A.  Guest Chaplain Policy – Exclusion of Nontheists

A member of the Pennsylvania House or a guest chaplain opens most legislative sessions with a prayer. A guest chaplain must be "a member of a regularly established church or religious organization." The House defines "opening prayer" as a chance for its members "to seek divine intervention in their work and their lives." Taken together, the House rules do not allow nontheists to give the opening prayer.

Once a guest chaplain is selected, he or she is told to craft a prayer "respectful of all religious beliefs." *Fields v. Speaker of the Pa. House of Representatives*, 251 F. Supp. 3d 772, 777 (M.D. Pa. 2017) (*Fields I*). The 203 members of the House "com[e] from a wide variety of faiths," so "efforts to deliver an inter-faith prayer are greatly appreciated." *Fields v. Speaker of the Pa. House of Representatives*, 327 F. Supp. 3d 748, 751 (M.D. Pa. 2018) (*Fields II*). Still, no House member reviews the prayer ahead of time.

8

From 2008 to 2016 the House prayer practice was as follows. For 678 legislative sessions, 575 began with a prayer. Of those prayers, 310 were offered by House members and 265 by guest chaplains. Among the 265 guest chaplains were 238 Christian clergy, 23 Jewish rabbis, three Muslim imams, and one monotheistic (yet otherwise unrecognizable) speaker. *Fields I*, 251 F. Supp. 3d at 777. The House branched out in 2017 from the Abrahamic faiths with its first Sikh guest chaplain. *Fields II*, 327 F. Supp. 3d at 752.

The plaintiffs here wish to offer the opening prayer as well. They represent a variety of nontheist organizations, including Secular Humanists, Unitarian Universalists, and Freethinkers.[3] Most of these groups self-identify as "religious" organizations, and their practices parallel those of a church. For instance, they gather regularly to discuss their worldviews, study important texts, observe annual celebrations, and participate in community service. *Fields I*, 251 F. Supp. 3d at 776. Their "clergy" even perform weddings and officiate at funerals. In short, they look and act like a church or synagogue in all ways but one: they do not profess belief in the existence of a higher power.

For this reason alone, the House denied their requests to offer a prayer. Each group had proposed an uplifting secular message — a "nontheistic" prayer touching on themes such as equality, unity, decency, hope, peace, compassion, tolerance, and justice. *Fields II*, 327 F. Supp. 3d at 750. But because

---

[3] While not identical, Secular Humanism and Freethought both posit that humans can be moral without any god; truth and morality should be based on logic, reason, and evidence, rather than on authority, tradition, or dogma. The nontheistic branches of Unitarian Universalism assert no creed, instead emphasizing tolerance and intellectual freedom.

their proposed invocations would not appeal to a "higher power," they were turned away. *Id.* at 753.

## B. Prayer Practice – Request to "Please Rise"

Two features of the prayer practice changed in response to this lawsuit. First, the Speaker of the House had asked guests to "please rise." *Id.* In 2017 he elaborated that guests "please rise as able." *Id.* Second, a sign outside the House chamber had explained that legislative sessions begin with a prayer and the Pledge of Allegiance, and it had asked that all guests "who are physically able" rise "during this order of business." After this lawsuit, "physically" was dropped. *Id.* at 754. On appeal, the parties dispute only whether the pre-2017 practice was unconstitutionally coercive.

The nontheists also challenge the coercive nature of one incident in 2012. After the Speaker's general request to "please rise," plaintiffs Brian Fields and Scott Rhoades remained seated. A House security guard singled them out and pressured them to stand. *Id.* at 753. However, they were not asked to leave, and no action was taken against them.

## C. Procedural History

The leaders of several nontheist groups, along with the groups themselves, brought this suit under 42 U.S.C. § 1983 against the Speaker of the House, the House Parliamentarian, and several House members. The plaintiffs took aim at the guest chaplain policy and the practice of asking that guests "please rise" for the prayer. First, they asserted that the policy of excluding nontheists from serving as guest chaplains violated the Establishment, Free Speech, Free Exercise, and Equal Protection Clauses. Second, they claimed that asking guests to "please rise" for the prayer was unconstitutionally coercive in violation of the Establishment Clause.

10

At the motion-to-dismiss stage, the District Court winnowed the claims to the alleged Establishment Clause violations. Reasoning that legislative prayer is government speech rather than speech by private citizens, the Court dismissed the claims brought under the Free Exercise, Free Speech, and Equal Protection Clauses. The Establishment Clause claims survived, however, because the Court needed a record at summary judgment to determine (1) "[w]hether history and tradition sanctify the House's line of demarcation between theistic and nontheistic chaplains," and (2) whether the Speaker's request to "please rise" for the prayer was unconstitutionally coercive. *Fields I*, 251 F. Supp. 3d at 789.

After discovery, both sides moved for summary judgment. The Court held that the guest chaplain policy violated the Establishment Clause and issued a permanent injunction. As for the requests to "please rise" for the opening prayer, it held that the current policy (amended in response to the lawsuit) was not coercive, but that the pre-2017 policy was.

Both sides have appealed.

**Jurisdiction and Standard of Review**

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction per 28 U.S.C. § 1291. We review the Court's findings of fact for clear error and its conclusions of law *de novo*. *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282–83 (3d Cir. 2014).

11

**Discussion**

**A. Guest Chaplain Policy – Establishment Clause Challenge**

Principally before us is whether the Pennsylvania House may intentionally exclude nontheists from offering prayers to open the legislative session. Because the House's policy preferring theistic over nontheistic prayers fits squarely within the historical tradition of legislative prayer, we part with the District Court on this point and uphold the prayer policy.

*1. Pennsylvania's Policy is Consistent with Historical Practice.*

**(i) Background on the Historical Framework —** History supplies our method of analyzing cases involving legislative prayer. In Establishment Clause challenges like this, we ask "whether the prayer practice" in question "fits within the tradition long followed in Congress and the state legislatures." *Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014). The early legislative practice of those who drafted the Establishment Clause "reveal[s] their intent" as to its scope. *Marsh v. Chambers*, 463 U.S. 783, 790 (1983); *see also New Doe Child #1 v. United States*, 901 F.3d 1015, 1020 (8th Cir. 2018) ("[H]istorical practices often reveal what the Establishment Clause was originally understood to permit."). In other words, we employ "a history and tradition test." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2092 (2019) (Kavanaugh, J., concurring); *see also Freedom From Religion Found., Inc. v. Cty. of Lehigh*, No. 17-3581, 2019 WL 3720709, — F.3d — (3d Cir. Aug. 8, 2019) (noting "the Supreme Court's more recent focus on evaluating challenges to government action in the context of historical practices and understandings," *id.* at *2, and explaining that "[a] practice's

12

fit within our Nation's public traditions may confirm its constitutionality," *id.* at \*5).

Twice the Supreme Court has drawn on early congressional practice to uphold legislative prayer. It emphasized that Congress approved the draft of the First Amendment in the same week it established paid congressional chaplains to provide opening prayers. *Marsh*, 463 U.S. at 790; *see also Town of Greece*, 572 U.S. at 575 ("The First Congress made it an early item of business to appoint and pay official chaplains, and both the House and Senate have maintained the office virtually uninterrupted since that time."). Congress approved theistic religious expression in other ways as well; a day after proposing the First Amendment, it "urged President Washington to proclaim 'a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts, the many and signal favours of Almighty God.'" *Lynch v Donnelly*, 465 U.S. 668, 675 n.2 (1984) (quoting A. Stokes & L. Pfeffer, *Church and State in the United States* 87 (rev. 1st ed. 1964)).

These insights — paired with the general use of history as the decisional framework — paved the way to the holdings in both *Marsh* and *Town of Greece*. The former upheld Nebraska's practice of offering legislative prayer by the same paid Presbyterian minister for 16 years. "In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society." *Marsh*, 463 U.S. at 792. Likewise, *Town of Greece* upheld sectarian (for example, invocations "in Jesus' name" for a given sect) as opposed to ecumenical (for example, nonsectarian or nondenominational invocations to a "generic God") legislative prayer by guest chaplains. *Town of Greece*, 572 U.S. at 572–73. The Court refused to "sweep away" a

13

practice that "was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Id.* at 577.

The D.C. Circuit recently deployed this historical framework to answer the same question before us today. *See Barker v. Conroy*, 921 F.3d 1118 (D.C. Cir. 2019) (Tatel, J.). There it considered the U.S. House of Representatives' practice of excluding nontheists from offering legislative prayers. Following the path charted by *Marsh* and *Town of Greece*, the Court defined its task as "determin[ing] whether that practice falls within the tradition the Supreme Court has recognized as consistent with the Establishment Clause." *Id.* at 1130. Put another way, "does the House's decision to limit the opening prayer to religious prayer fit 'within the tradition long followed in Congress and the state legislatures'?" *Id.* (quoting *Town of Greece*, 572 U.S. at 577). The answer was "yes." *Id.*

Even more recently, the Supreme Court has expanded its historical framework beyond the confines of legislative prayer. In rejecting an Establishment Clause challenge to a Christian cross commemorating World War I on state property, the Court held that the memorial "must be viewed in [its] historical context." *Am. Legion*, 139 S. Ct. at 2074. It also announced "a presumption of constitutionality for longstanding monuments, symbols, and practices." *Id.* at 2082. Indeed, our Court just reiterated the "strong presumption of constitutionality" for practices like the one before us. *See Freedom From Religion Found.*, 2019 WL 3720709, at *3 (quoting *Am. Legion*, 139 S. Ct. at 2085). That presumption applies to the longstanding practice of theistic prayer in the United States; since the first congressional prayers in 1789, the U.S. House of Representatives "has never had an openly atheist or agnostic guest chaplain." *Barker*, 921 F.3d at 1122.

14

With this background on the historical framework — and bearing in mind the thumb on the scale for the constitutionality of longstanding practices like that of Pennsylvania House, *see Am. Legion*, 139 S. Ct. at 2085 — we turn to two reasons why Pennsylvania's practice is historically sound. First, only theistic prayer can satisfy all the traditional purposes of legislative prayer. Second, the Supreme Court has long taken as given that prayer presumes invoking a higher power.

**(ii) Purposes of Legislative Prayer —** Legislative prayer has historically served many purposes, both secular and religious. Because only theistic prayer can achieve them all, the historical tradition supports the House's choice to restrict prayer to theistic invocations.

To be sure, legislative prayer achieves several secular purposes. It solemnizes the occasion by "lend[ing] gravity" to the proceedings and placing legislators in a "deliberative frame of mind." *Town of Greece*, 572 U.S. at 587, 570. It provides a moment of "quiet reflection" that "sets the mind to a higher purpose." *Id.* at 587. It unifies lawmakers by inviting them "to reflect upon shared ideals and common ends before they embark on the fractious business of governing." *Id.* at 583. And it stresses the values of justice, peace, and wisdom. *Id.*

No surprise, then, that even the D.C. Circuit in *Barker* saw it was "at least plausible" that the word "prayer" could "encompass[] a secular invocation." 921 F.3d at 1125. Channeling these secular purposes, at least seven state legislative chambers (including the Pennsylvania Senate) have begun to allow nontheistic invocations. *See* Br. of Amici Curiae U.S. Reps. Jared Huffman & Jaime Raskin at 5–11.

But, as a matter of traditional practice, a petition to human wisdom and the power of science does not capture the

15

full sense of "prayer," historically understood. At bottom, legislative prayers seek "divine guidance" in lawmaking. *Town of Greece*, 572 U.S. at 570; *Marsh*, 463 U.S. at 792. *See generally* Br. of Amici Curiae Pa. Members of Congress at 4–15. They also allow the legislature to "acknowledge the place religion holds in the lives of many private citizens." *Town of Greece*, 572 U.S. at 587; *see also Am. Legion*, 139 S. Ct. at 2089 ("The practice begun by the First Congress stands out as . . . a recognition of the important role that religion plays in the lives of many Americans. Where . . . practices with a longstanding history follow in that tradition, they are likewise constitutional."). And they "connect [lawmakers] to a tradition dating to the time of the Framers," *Town of Greece*, 572 U.S. at 588, one that has always included a higher power.

Finally, prayers "accommodate the spiritual needs of lawmakers." *Id.* Though this purpose is now accepted by the Supreme Court, *see id.*, one might wonder whether a religious minister can accommodate the spiritual needs of a "secular agnostic" member of the Pennsylvania House, *see Fields II*, 327 F. Supp. 3d at 763, or vice versa. Or, for that matter, can a Catholic priest in the U.S. Senate accommodate the spiritual needs of Chuck Schumer, or a Jewish rabbi those of Mitt Romney? These questions are as old as the Republic, but they have been settled since the Founding. In the Continental Congress, John Jay and John Rutledge opposed legislative prayer on the theory that the delegates were "so divided in religious sentiments" that they "could not join in the same act of worship." *Marsh*, 463 U.S. at 791 (quotations omitted). The two future Chief Justices could not see what an Episcopalian minister could possibly offer a Presbyterian or Congregationalist lawmaker. Their view lost out, however, when Samuel Adams countered that "he was no bigot" and would gladly "hear a prayer from a gentleman of piety and virtue," no matter his denomination. *Id.* at 792 (quotations omitted); *see also Am. Legion*, 139 S. Ct. at 2088. Hence we

16

take as given that an invocation by a prayer-giver of one theistic faith can accommodate the spiritual needs of listeners of other theistic faiths.

In sum, the view that prayer "necessarily requires that a 'higher power' be invoked" may be "overly narrow" by current standards. *Williamson v. Brevard Cty.*, 276 F. Supp. 3d 1260, 1281 (M.D. Fla. 2017), *aff'd in part on other grounds*, 928 F.3d 1296 (11th Cir. 2019). But modern, evolving standards are not our lodestar when evaluating a practice like this; instead, past is prologue for our inquiry. And history tells us that only theistic invocations can achieve all the purposes of legislative prayer. Thus the historical tradition supports the House's choice to restrict its invocations to theistic prayer.

**(iii) "Prayer" Presumes a Higher Power. —** The Supreme Court has long taken as given that prayer presumes a higher power. To begin, the Court in *Marsh* described legislative prayer as "invok[ing] Divine guidance on a public body entrusted with making the laws," 463 U.S. at 792, and quoted with approval Justice Douglas's statement that "we are a religious people whose institutions presuppose a Supreme Being," *id.* (quoting *Zorach v. Clauson*, 343 U.S. 306, 313 (1952)). Even the dissent in *Marsh* stressed that "prayer is fundamentally and necessarily religious," and distinguished it from a nontheistic "moral sense" or "aesthetic feeling." *Id.* at 810 (Brennan, J., dissenting) (quotations omitted).

The assumption that prayer must be theistic apparently persuaded then-Judge Ruth Bader Ginsburg that Congress's practice of excluding nontheists from offering opening prayers did not violate the Establishment Clause. *See Kurtz v. Baker*, 829 F.2d 1133, 1147 (D.C. Cir. 1987) (R.B. Ginsburg, J., dissenting). Although the challenge was dismissed on standing grounds, she wrote separately that she would have upheld Congress's policy on the merits. "The common feature" of

17

legislative prayer was "the invocation of 'Divine guidance.'" *Id.* (quoting *Marsh*, 463 U.S. at 792). Thus we believe later-Justice Ginsburg would have rejected the challenger's "claim of a constitutional right not to be excluded, because he is a nontheist, from the opportunity" to offer a prayer. *Id.* at 1146.

More recently, the notion that prayer is definitionally theistic suffuses the opinions in *Town of Greece*. The majority opinion described prayer as a chance to "show respect for the divine," 572 U.S. at 584, and to "address [one's] own God or gods," *id.* at 582. Prayer is an "acknowledgment[] of the divine," *id.* at 587, or of "belief in a higher power," *id.* at 591. It is a "reference to the sacred," *id.* at 581, or, more simply, it is "religious worship," *id.* at 588 (quotations omitted). Even the dissent cast legislative prayers as "[c]eremonial references to the divine," *id.* at 635 (Kagan, J., dissenting), and, pejoratively, as "government-sponsored worship," *id.* at 628. Urging nonsectarian prayer, it asserted that an ecumenical message would still "unite[]" listeners with "a respect paid higher providence." *Id.* at 632 (quoting *Joyner v. Forsyth Cty.*, 653 F.3d 341, 347 (4th Cir. 2011)).

Just as *Marsh* persuaded then-Judge Ginsburg that Congress's policy excluding nontheistic prayers was permissible, *Marsh* and *Town of Greece* together convinced the D.C. Circuit to hold that the policy did not violate the Establishment Clause. *See Barker*, 921 F.3d at 1121. It explained that *Marsh* "took as a given the religious nature of legislative prayer," and quoted that "we are a religious people whose institutions presuppose a Supreme Being." *Id.* at 1130 (quoting *Marsh*, 463 U.S. at 792). Turning to *Town of Greece*, the Court saw the same assumption that prayer requires a deity, stressing *Town of Greece*'s statement that "legislative prayer, *while religious in nature*, has long been understood as compatible with the Establishment Clause." *Id.* at 1131 (quoting *Town of Greece*, 572 U.S. at 575) (emphasis added by

18

*Barker*). Since *Barker*, the Supreme Court has underscored the point yet again: "prayer is by definition religious." *Am. Legion*, 139 S. Ct. at 2087.

Recognizing that prayer has traditionally presumed a higher power does not amount to "instituting a religious orthodoxy." Dissenting Op. at 10. Our dissenting colleague thinks otherwise; in his view, accepting that prayer has (until very recently) been an entreaty to a divine being is tantamount to "the government actively lend[ing] its power and prestige to the religious theory that a 'higher power' or God indeed exists." *Id.* at 10. But if that were so, then we would have to rethink settled law upholding, for example, the motto "In God We Trust" on our coinage. *See, e.g.*, *New Doe Child #1*, 901 F.3d at 1019 (8th Cir. 2018); *Mayle v. United States*, 891 F.3d 680, 684–86 (7th Cir. 2018); *Newdow v. Peterson*, 753 F.3d 105, 108 (2d Cir. 2014) (*per curiam*); *Newdow v. Lefevre*, 598 F.3d 638, 645 (9th Cir. 2010); *Gaylor v. United States*, 74 F.3d 214, 217–18 (10th Cir. 1996); *O'Hair v. Murray*, 588 F.2d 1144, 1144 (5th Cir. 1979) (*per curiam*). We would also need to scrub the phrase "under God" from the Pledge of Allegiance — again upending established precedent. *See, e.g.*, *Freedom From Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1, 6 n.13 (1st Cir. 2010); *Croft v. Perry*, 624 F.3d 157, 166 (5th Cir. 2010); *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1037 (9th Cir. 2010); *Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 408 (4th Cir. 2005); *Sherman v. Cmty. Consol. Sch. Dist. 21*, 980 F.2d 437, 445 (7th Cir. 1992); *see also Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 18 (2004) (Rehnquist, C.J., concurring in the judgment). Instead of rocking the constitutional boat, today we merely observe what the Supreme Court has long taken as given: that prayer traditionally presumes a higher power. Because this notion flows from the historical understanding and practice of legislative prayer, it lends further support to the policy of the Pennsylvania House.

Nor is our observation about traditional prayer "tantamount to a holding that legislative prayer *must* be theistic in nature." Dissenting Op. at 8 n.4 (emphasis in text). A legislative body is free to open its sessions with secular invocations. We hold only that it is not required to do so.

**(iv) Effect of Challengers' Status as "Religions" —** The nontheistic organizations that brought this challenge may be "religions" for First Amendment purposes. *See Torcaso v. Watkins*, 367 U.S. 488, 495 n.11 (1961). Indeed, the Supreme Court "has moved considerably beyond the wholly theistic interpretation" of the term "religion." *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025, 1031 (3d Cir. 1981). Its understanding of "religion" now "includes nontheistic and atheistic beliefs, as well as theistic ones." *Kaufman v. McCaughtry*, 419 F.3d 678, 682 (7th Cir. 2005); *accord* Dissenting Op. at 1.

Still, the policy of the Pennsylvania House does not transgress the rule against favoring "one religion over another, or religion over irreligion." *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 875 (2005). That is because "whether atheism is a 'religion' for First Amendment purposes is a . . . different question than whether its adherents believe in a supreme being." *Kaufman*, 419 F.3d at 681. And only the latter question — the existence of a high power to whom one can pray for divine guidance in lawmaking — is a necessary element of traditional legislative prayer. The nontheists here may be members of "religions" for First Amendment purposes, but, because they do not proclaim the existence of a higher power, they cannot offer religious prayer in the historical sense. *Cf. Williamson*, 928 F.3d 1296 (concluding that policy of chaplain selection barring prayers from nontheistic Secular Humanists, as well as from Rastafarians, Deists, Wiccans, and Hindus, *id.* at 1313–14, was unconstitutional discrimination "on the basis of religion," *id.* at 1316, but only as against the

20

theistic religions, *id.* at 1311, while refusing to decide "whether atheists and secular humanists must be allowed to deliver non-theistic invocations," *id.* at 1299, even as the Court recognized that atheistic beliefs constitute a "religion" for Establishment Clause purposes, *id.* at 1300). And because history guides our inquiry in matters of legislative prayer, the Pennsylvania House may insist on traditional, theistic prayers.

In doing so, the House does not "impermissibly direct[] or control[] the content of the prayers delivered by guest chaplains." Dissenting Op. at 13. To the contrary, no House member reviews a guest chaplain's prayer ahead of time. Chaplains are simply instructed to be "respectful of all religious beliefs," *Fields I*, 251 F. Supp. 3d at 777, and are encouraged to "deliver an inter-faith prayer," *Fields II*, 327 F. Supp. 3d at 751.

### 2. Further Exclusions are Impermissible.

Our decision today does not open the door to more extreme exclusions. Neutrality principles emanating from *Marsh* and *Town of Greece* hold the historical framework in check and prevent grandfathering antiquated discrimination into the present day.

Taken too far, importing historical legislative-prayer practices would justify excluding all sorts of theists. For instance, Justice Scalia maintained that, in matters of "public acknowledgment of religious belief," the nation's "historical practices" demonstrate that the government could exclude not only "devout atheists" but also "polytheists" (those who believe in multiple gods). *McCreary Cty.*, 545 U.S. at 893 (Scalia, J., dissenting). In the same vein, the Fourth Circuit has approved the exclusion of polytheist guest chaplains from legislative prayer. *Simpson v. Chesterfield Cty. Bd. of Supervisors*, 404 F.3d 276, 286 (4th Cir. 2005) (Wilkinson, J.).

21

There a county opened its board meetings with prayers from the leaders of "monotheistic congregations" but denied a Wiccan witch the chance to offer a prayer. *Id.* at 284. The Court noted the more restrictive practice approved in *Marsh* — one permanent Presbyterian minister for 16 years. Compared to that baseline, it reasoned, the county's monotheists-only rule was "an indisputably broad and inclusive legislative invocation practice." *Id.* at 285 n.4. "[T]he practice here is in many ways more inclusive than that approved by the *Marsh* Court." *Id.* at 285. As a result, even after a lawmaking body opens its door to guest chaplains, it may still opt not "to go beyond the monotheistic tradition." *Id.* at 286. *But see Williamson*, 928 F.3d at 1315 (striking down county policy of chaplain selection that "categorically exclude[d] certain faiths — some monotheistic and apparently all polytheistic ones — based on their belief systems").

The Pennsylvania House pushes this exclusionary logic to the extreme, claiming that a prayer practice is permissible unless it allows chaplains from only a single sect. The House emphasizes "legislatures' long history of turning away all but a few faiths," and urges that "[h]istory confirms the constitutionality of prayer practices far more exclusive" than the theists-only rule here. Opening Br. of Appellants/Cross-Appellees at 40. So long as *two sects* are represented — even to the exclusion of all others — the House argues that the prayer practice is constitutional. After all, by approving the sole use of a chaplain from a *single* sect for 16 years, *Marsh* was even more exclusive. *Cf. Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk*, 758 F.3d 869, 874 (7th Cir. 2014) (Easterbrook, J.) (*dictum*) ("*Marsh* and *Greece* show that a government may, consistent with the First Amendment, open legislative sessions with Christian prayers while not inviting leaders of other religions.").

What the House sees as the outer bound of its constitutional authority, its opponents abhor as the bottom of a slippery slope greased by our decision today. Given the specter of the House's proposed two-sect rule, *amici* on the side of the nontheists warn that their exclusion could justify barring the legislative pulpit to other religious minorities as well. *See* Br. of Amici Curiae Anti-Defamation League et al. at 6. If the House may rely on historical practice to exclude nontheists, may it also do so to prohibit prayers by Hindus, Jews, and Quakers?

Plainly not. To begin, our decision today rests on only two pillars: (1) the purpose of legislative prayer is to invoke divine guidance, and (2) "prayer" presupposes a higher power. Neither supports excluding any group of theists. And contrary to our dissenting colleague's assertion, our reasoning today could not be twisted to exclude Buddhists — an outcome we agree would be "unconscionable." Dissenting Op. at 7; *see, e.g.*, Alex Rogers, *Dalai Lama Gives Prayer on Senate Floor*, Time (Mar. 6, 2014), https://time.com/14056/dalai-lama-senate-prayer/ (recounting that the Dalai Lama opened his invocation before the U.S. Senate in 2014 with the exhortation to "pray to Buddha and all other gods").

Next, the two-sect rule is unworkable. At what level of generality are we to define a sect? Is "Christianity" a sect? *Compare Lund v. Rowan Cty.*, 863 F.3d 268, 280 (4th Cir. 2017) (*en banc*) (disapproving of government's alignment with the "particular faith" of Christianity), *with Am. Legion*, 139 S. Ct. at 2096 (Thomas, J., concurring in the judgment) ("Christianity is not a 'sect.'"), *and id.* at 2107 n.7 (Ginsburg, J., dissenting) ("Christianity comprises numerous denominations."). If not, does Protestantism comprise one sect or many? Is the Anglican Communion a single sect despite theological divisions among its churches?

23

More fundamentally, the two-sect rule is inconsistent with nondiscrimination principles in *Marsh* and *Town of Greece*. Per *Marsh*, the "prayer opportunity" may not be "exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Marsh*, 463 U.S. at 794–95; *see also Am. Legion*, 139 S. Ct. at 2088 (noting the First Congress saw that "legislative prayer needed to be inclusive rather than divisive").

As to the selection of the prayer-giver, *Marsh* instructed that a chaplain's appointment could not "stem[] from an impermissible motive." 463 U.S. at 793. The Eleventh Circuit has read *Marsh*'s "impermissible motive" standard to "prohibit[] purposeful discrimination." *Pelphrey v. Cobb Cty.*, 547 F.3d 1263, 1281 (11th Cir. 2008). The Court concluded this rule had been violated when the phone book used by a county in Georgia to invite guest chaplains contained "a long and continuous line through certain categories of faiths," including Muslims and Latter-day Saints. *Id.* at 1282. "The categorical exclusion of certain faiths based on their beliefs," it explained, "is unconstitutional." *Id.* This statement is enough to foreclose the House's two-sect rule.

But, as we have explained, a prayer by a Muslim is different in kind from one by a nontheist — different enough that a legislature may permissibly exclude the latter but not the former. The Eleventh Circuit itself sees discrimination against theists as unlike discrimination against nontheists. The Court recently drew on its rule that legislators "may not categorically exclude from consideration speakers from a religion simply because they do not like the nature of its beliefs," *Williamson*, 928 F.3d at 1299, to strike down a county's invocation policy of "favoring some monotheistic religions over others and disfavoring and excluding — at least — religions that are polytheistic, pantheistic [belief that the entire universe and God are one — "God is everything and everything is God," <u>Africa</u>,

24

662 F.2d at 1033 n.16 (quotation omitted)], or otherwise outside of the 'mainstream,'" *Williamson*, 928 F.3d at 1311. But it stopped short of applying the same rule to the categorical exclusion of prayers by nontheists, refusing to decide "whether the [c]ounty is obliged to allow . . . atheists and Secular Humanists . . . the opportunity to deliver an invocation at the start of one of its board meetings." *Id.* at 1316.

Turning to the opinion in *Town of Greece*, three features relating to nondiscrimination stand out. First, it noted that an 1853 study by Congress of its own prayer practice found that "no faith was excluded by law, nor any favored." *Town of Greece*, 572 U.S. at 576; *see Am. Legion*, 139 S. Ct. at 2089 ("The practice begun by the First Congress stands out as . . . an honest endeavor to achieve inclusivity and nondiscrimination . . . ."). Such a finding is inconsistent with the House's proposed two-sect rule. As to nontheists, however, we doubt whether the Congress of 1853 understood atheism as a "faith," given that its study was from an era that still defined "religion" as "one's views of his relations to his Creator." *Cf. Davis v. Beason*, 133 U.S. 333, 342 (1890).

Second, as for the specific prayer practice at issue in *Town of Greece*, the Court stressed that the town's selection of guest chaplains was admirably inclusive. "The town at no point excluded or denied an opportunity to a would-be prayer giver." *Town of Greece*, 572 U.S. at 571. "[A] minister or layperson of any persuasion, including an atheist, could give the invocation." *Id.* Even the D.C. Circuit, in upholding Congress's theists-only rule, marveled that the practice in *Town of Greece* was "significantly more inclusive than the one in *Marsh*." *Barker*, 921 F.3d at 1131.

The *en banc* Fourth Circuit contrasted the inclusivity in *Town of Greece* with the comparatively "rigid, restrictive practice" of a North Carolina county in which only the county

25

commissioners (all Christians) were permitted to offer the prayer. *See Lund*, 863 F.3d at 282. "By opening its prayer opportunity to all comers, the [T]own [of Greece] cultivated an atmosphere of greater tolerance and inclusion." *Id.* The Fourth Circuit struck down the county's practice as falling short of the "flexible, inclusive approach" upheld in *Town of Greece*. *Id.* By allowing guest chaplains of any theistic tradition, the Pennsylvania House is more inclusive than the county in *Lund*; by excluding nontheists, the House is less inclusive than the town in *Town of Greece*, at least as a facial matter, but permissibly so.

Third, *Town of Greece* held that a guest chaplain policy resulting in prayers of predominantly one religion is permissible so long as the selection process is not discriminatory:

> That nearly all of the congregations in town turned out to be Christian does not reflect an aversion or bias on the part of town leaders against minority faiths. *So long as the town maintains a policy of nondiscrimination*, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing.

*Town of Greece*, 572 U.S. at 585–86 (emphasis added). Justice Alito's concurrence reinforced these nondiscrimination principles. The town's failure to invite the rabbis of certain Jewish synagogues "was at worst careless, and it was not done with a discriminatory intent." *Id.* at 597 (Alito, J., concurring). "I would view this case very differently if the omission of these synagogues were intentional." *Id.* Likewise, the Sixth Circuit has taken the "policy of nondiscrimination" language in *Town of Greece* to mean that a policy of prayer-giver selection must

26

be "facially neutral." *Bormuth v. Cty. of Jackson*, 870 F.3d 494, 514 (6th Cir. 2017) (*en banc*).

There appears to be a dispute brewing over whether a "policy of nondiscrimination" is needed to render a prayer practice constitutional. For Justice Kagan, "neutrality" is a "constitutional requirement" that calls for "pluralism and inclusion." *Town of Greece*, 572 U.S. at 616 (Kagan, J., dissenting); *see also Am. Legion*, 139 S. Ct. at 2094 (Kagan, J., concurring) (stressing "the values of neutrality and inclusion that the First Amendment demands"). For Justice Kavanaugh, by contrast, equal treatment is only one way to salvage a challenged practice; even a non-neutral practice passes muster if it is "not coercive" and is "rooted in history and tradition." *Id.* at 2093 (Kavanaugh, J., concurring).

We need not resolve that issue. The D.C. Circuit in *Barker* sidestepped the nondiscrimination requirement as applied to nontheists. "[A]lthough the [Supreme] Court has warned against discriminating among religions," the Circuit Court reasoned, "it has never suggested that legislatures must allow secular as well as religious prayer." *Barker*, 921 F.3d at 1131. We share that view.

### 3.   Further Inclusion is Not Needed.

Before moving on from the Establishment Clause claim, we explain why a supercharged nondiscrimination rule does not apply to legislative prayer. To begin, "there is no single formula for resolving Establishment Clause challenges." *Am. Legion*, 139 S. Ct. at 2090 (Breyer, J., concurring). Instead, legislative prayer "fits into a special nook — a narrow space tightly sealed off from otherwise applicable [F]irst [A]mendment doctrine." *Kurtz*, 829 F.2d at 1147 (R.B. Ginsburg, J., dissenting). And on this doctrinal island,

27

principles of neutrality must not be so onerous that they signal the end of legislative prayer altogether.

Taken too far, a nondiscrimination rule in legislative prayer provides a heckler's veto to voices on the fringe. If, in the name of nondiscrimination, the House must abide prayers from nontheists, Satanists, and groups that deride religion, it will stop accepting guest chaplains altogether. This will result in less diversity of religious expression — a "particularly perverse result." *Simpson*, 404 F.3d at 287 (upholding exclusion of Wiccan from prayer practice to avoid "push[ing] localities intent on avoiding litigation to select only one minister from only one faith"); *cf. Freedom from Religion Found., Inc. v. City of Warren*, 707 F.3d 686, 694 (6th Cir. 2013) (noting, in the context of religious holiday displays, that "requiring governments to add all comers to the mix" would create a "poison pill"). In matters of promoting religious diversity, the perfect should not be the enemy of the good.

A nondiscrimination rule that regulates guest-chaplain programs out of existence would also be a step backward as a constitutional matter. Under a permanent-chaplain model, in which "the governmental body hires a faith leader (necessarily of one faith) to say the prayers," the risk of an impermissible endorsement of religion "grows, rather than diminishes." *Bormuth*, 870 F.3d at 523 (Sutton, J., concurring). By contrast, the use of guest chaplains weighs in favor of constitutionality because it promotes diversity of religious expression. *See Town of Greece*, 572 U.S. at 632 (Kagan, J., dissenting) (urging legislatures to invite "clergy of many faiths to serve as chaplains" so that "the government does not identify itself with one religion"). Congress's adoption of a guest-chaplain program in the mid-1800s allowed it to hear an opening prayer from a Jewish rabbi as early as 1860 and, eventually, prayers from Muslims, Hindus, and Buddhists. *Am. Legion*, 139 S. Ct. at 2088.

28

Finally, a nondiscrimination rule that parks guest-chaplain programs would contrast incongruously with permissive rules for permanent chaplains. In the world of permanent chaplains, a legislature may leave one paid chaplain from a single denomination in place for decades. *See Marsh*, 463 U.S. at 793. For guest chaplains, however, a stringent rule against exclusions would mean a legislature would have to accept all comers. *Cf.* Dissenting Op. at 15. This asymmetry makes little sense.

## B. Guest Chaplain Policy – Free Speech Challenge

The nontheists argue that the House has violated their free-speech rights by allowing only theistic prayers. Because legislative prayer is government speech, we affirm the District Court's dismissal of that claim.

### 1. *Legislative Prayer Is Government Speech.*

Like the District Court, we conclude that legislative prayer is government speech. (This conclusion bears not only on the free-speech claim, but also on the free-exercise and equal-protection claims.) The Supreme Court has identified several factors relevant for distinguishing government speech from private speech, including a reasonable observer's perception of the speaker and the government's control over the message. *See, e.g.*, *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2248–50 (2015). The prayer here falls on the government side of the line.

To begin, legislative prayer is expression by a government. It is "symbolic expression," *Town of Greece*, 572 U.S. at 575, that allows lawmakers to convey their own message by "show[ing] who and what they are," *id.* at 588. A legislative prayer, even one offered by a guest chaplain, is a "chance to pray *on behalf of the government*." *Turner v. City*

*Council of Fredericksburg*, 534 F.3d 352, 356 (4th Cir. 2008) (O'Connor, J.) (emphasis added). The government may control "what is or is not expressed" in order to "convey its own message." *Simpson*, 404 F.3d at 288 (quotations omitted). The prayer is "what a chosen agent of the government says as part of the government's own operations." *Ctr. for Inquiry*, 758 F.3d at 874. At bottom, the government is the speaker.

The government is the listener as well. "The principal audience for these invocations is not, indeed, the public but lawmakers themselves." *Town of Greece*, 572 U.S. at 587. Unlike prayer in schools, in the legislative setting "government officials invoke spiritual inspiration entirely for their own benefit." *Lee v. Weisman*, 505 U.S. 577, 630 n.8 (1992) (Souter, J., concurring); *see also Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1142 (9th Cir. 2018) (explaining that legislative prayer is "directed at lawmakers themselves"). This is so even though the prayer here is given by a member of the public who faces the public — the same conditions that existed in *Town of Greece*. "[T]he government speech doctrine may apply even when the government uses other parties to express its message." *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 330 (1st Cir. 2009). As a largely internal matter — *by* lawmakers and primarily *for* lawmakers — legislative prayer receives double deference.

Legislative prayer is government speech even though some limits exist on what the government may say. Legislative prayers may not "proselytize" or "denigrate" any faith, *see Town of Greece*, 572 U.S. at 585; *Marsh*, 463 U.S. at 794–95, and the government may not "mandate a civic religion" by requiring that guest chaplains offer only nonsectarian prayer, *Town of Greece*, 572 U.S. at 581. But these restrictions all flow from the Establishment Clause. Because "government speech must comport with the Establishment Clause" anyway,

*Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009), any Establishment Clause–based limits do not change the conclusion that legislative prayer is government speech.

Supporting this conclusion is a recent three-Justice dissent from a denial of *certiorari* that cited *Marsh* as an example of "government-sponsored prayer" in which "the government itself is engaging in religious speech." *See Morris Cty. Bd. of Chosen Freeholders v. Freedom From Religion Found.*, 139 S. Ct. 909, 910–11 (2019) (Kavanaugh, J., joined by Justices Alito and Gorsuch, dissenting from denial of certiorari). And, as explained above, the Seventh and Fourth Circuits agree. *See Ctr. for Inquiry*, 758 F.3d at 874; *Simpson*, 404 F.3d at 288.

Evidently, only one Court disagrees. The District Court in *Williamson* was "not persuaded that legislative prayer claims are necessarily subject to analysis under only the Establishment Clause." *Williamson*, 276 F. Supp. 3d at 1294. Instead, it explained that the availability of a potential cause of action "depends on the circumstances of each case and the nature of the claim being asserted." *Id.* On appeal, however, the Eleventh Circuit refused to adopt this case-by-case approach. *See Williamson*, 928 F.3d at 1316 ("The trial court's injunction goes too far and says too much."). We follow suit and join the Seventh and Fourth Circuits, as well as at least three Supreme Court Justices, in holding that legislative prayer is government speech.

### 2. The Free Speech Clause Does Not Regulate Government Speech.

Because legislative prayer is government speech, the analysis is straightforward. "[T]he Free Speech Clause does not regulate government speech." *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) (quoting *Summum*, 555 U.S. at 467). The

31

nontheists' claim thus fails.  *See Simpson*, 404 F.3d at 287–88 (same); *see also Kurtz*, 829 F.2d at 1147 (R.B. Ginsburg, J., dissenting) (predicting that the Supreme Court would reject a free-speech challenge to Congress's theists-only chaplain policy and dismissing challenger's argument to the contrary as exhibiting "little realism and large indulgence in wishful thinking").  As a result, we affirm the District Court on this issue.

## C.  Guest Chaplain Policy – Free Exercise Challenge

The nontheists also challenge the guest chaplain policy on free-exercise grounds.  Because legislative prayer is government speech, the Free Exercise Clause does not apply, and the nontheists' free-exercise claim fails.  *See Simpson*, 404 F.3d at 287–88 (same).  Judge Niemeyer concurred in *Simpson* to stress this point: "when members of a governmental body participate in a prayer for themselves and do not impose it on or prescribe it for *the people*, the religious liberties secured *to the people* by the First Amendment are not *directly* implicated."  *Id.* at 289 (Niemeyer, J., concurring).  In a subsequent Fourth Circuit case, retired Justice O'Connor (sitting by designation) made a similar point: although the challenger refused to offer a legislative prayer "in the manner that the government had proscribed," he remained "free to pray on his own behalf, in nongovernmental endeavors, in the manner dictated by his conscience."  *Turner*, 534 F.3d at 356.  Because the free-exercise challenge fails, we affirm the District Court as well.

## D.  Guest Chaplain Policy – Equal Protection Challenge

The nontheists argue that the House's theists-only guest chaplain policy violates their equal-protection rights.  But private citizens "have no personal interest in government speech on which to base an equal protection claim."  *Johnson*

32

*v. Poway Unified Sch. Dist.*, 658 F.3d 954, 970 (9th Cir. 2011) (citing *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1017 (9th Cir. 2000)). "It is the very business of government to favor and disfavor points of view." *Id.* at 975 (quoting *Nat'l Endowment for Arts v. Finley,* 524 U.S. 569, 598 (1998) (Scalia, J., concurring)). For this reason, the Fourth Circuit has rejected an equal-protection challenge to legislative prayer. *See Simpson*, 404 F.3d at 287–88. The Sixth Circuit has done the same in the context of a city's choice to accept some, and reject other, holiday displays on city property. *See Freedom from Religion Found.*, 707 F.3d at 698 ("To the extent the Foundation means to claim that the City's government speech commemorating the holiday disparately treats its preferred message, the answer is: welcome to the crowd."). The Court drew on this precedent to rebuff an equal-protection challenge to the motto "In God We Trust" on U.S. coinage brought by atheists claiming the government's speech "disparately treat[ed]" their views. *New Doe Child #1 v. Cong. of United States*, 891 F.3d 578, 594 (6th Cir. 2018).

Likewise, the Fifth Circuit concluded that a private plaintiff lacked standing to bring an equal-protection challenge to the Confederate flag's presence in the Mississippi state flag, explaining that "exposure to a discriminatory message, without a corresponding denial of equal treatment, is insufficient to plead injury in an equal protection case." *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017). To be sure, the Court explained, "discriminatory government speech would certainly be useful in proving a discriminatory treatment claim, because it loudly speaks to discriminatory purpose." *Id.* at 251 n.4. On its own, however, disparate messaging is not enough to make out an equal-protection violation. "[T]he gravamen of an equal protection claim is differential governmental treatment, not differential governmental messaging." *Id.* at 250.

We acknowledge that the First and D.C. Circuits have suggested (without deciding and without explanation) that the Equal Protection Clause might apply to government speech. *See Sutliffe*, 584 F.3d at 331 n.9 (noting that the Equal Protection Clause "may be . . . another restraint on government speech"); *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (noting that the Equal Protection Clause "might . . . limit the government as speaker," but observing that "[t]he curator of a state-owned museum, for example, may decide to display only busts of Union Army generals of the Civil War, or the curator may decide to exhibit only busts of Confederate generals."). And in a concurrence in *Summum*, Justice Stevens stated that "government speakers are bound by" both "the Establishment and Equal Protection Clauses." *Summum*, 555 U.S. at 482 (Stevens, J., concurring). Even so, we join the authority holding that the Equal Protection Clause does not apply to government speech. As a result, we affirm the District Court's rejection of this claim.[4]

**E. Coercion Claim**

The nontheists have not appealed the District Court's ruling that the House's current practice of asking visitors to "please rise as able" is not coercive. As a result, we review only the pre-2017 practice, which had two features. First, the

---

[4]    Although she didn't couch her conclusion as a matter of government speech, then-Judge Ginsburg also stated that a nontheist's equal-protection challenge to Congress's theists-only prayer policy should fail. Because "the historic practice of an opening prayer burdens no 'fundamental right' of non-theists," the challenger could not "salvage his failed first amendment claim by cloaking it in a fifth amendment due process (equal protection component) mantle." *Kurtz*, 829 F.2d at 1147 n.3 (R.B. Ginsburg, J., dissenting).

sign outside the House chamber read, "[a]ll guests who are physically able are requested to stand during [the prayer]," and the Speaker introduced the prayer by requesting that "[m]embers and all guests, please rise." Second, in the 2012 incident, a House security guard singled out Fields and Rhoades and pressured them to stand.

To begin, we assess whether the challenge to either feature is moot. The House has voluntarily ceased both aspects of its pre-2017 practice. It has amended the sign and Speaker statement to their current (undisputed) form, and it has instructed its security guards not to single out visitors who remain seated during the prayer.

Voluntary cessation of challenged activity will moot a case only if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (quoting *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)); *see also United States v. Gov't of Virgin Islands*, 363 F.3d 276, 285 (3d Cir. 2004). The party urging mootness bears the "heavy burden" of showing that it will not "revert to" its prior policy. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017) (quoting *Friends of the Earth*, 528 U.S. at 189).

Here, the House continues to defend the constitutionality of the pre-2017 sign and Speaker statement despite its counsel's statements at oral argument that it would not reinstate them. As a result, it is not "absolutely clear" that the House would not revert to its pre-2017 policy in the future. In fact, it only changed the sign and statement in response to this litigation, which weighs against mootness. *See Marcavage v. Nat'l Park Serv.*, 666 F.3d 856, 861 (3d Cir. 2012). And the nontheists seek not only an injunction, but also a declaratory

35

judgment about the pre-2017 practice. In this context, the sign-and-statement feature of the coercion claim is not moot.

But the 2012 incident of pressure from a security guard is moot. The House has disavowed the security guard's actions in this one-off incident. *See* Second Br. of Appellants/Cross-Appellees at 48 n.31 ("The House has not argued, and would not argue, that visitors should be publicly confronted for refusing to stand."). Its choice not to defend the security guard's actions weighs in favor of mootness. *Cf. Marcavage*, 666 F.3d at 861 (finding mootness when the Park Service did not challenge an adverse injunction on appeal and had stopped enforcing its enjoined rule). Its decision not to defend on this practice is wise, given that the security guard's behavior almost certainly crossed the constitutional line. *See Town of Greece*, 572 U.S. at 588 (suggesting that coercion occurs when a lawmaker "direct[s] the public to participate in the prayers" or "single[s] out dissidents for opprobrium").

Turning from mootness to the merits of the coercion claim, both sides agree that Justice Kennedy's plurality opinion in *Town of Greece* controls on the question of coercion in legislative prayer. *See, e.g.*, Br. of Appellees/Cross-Appellants at 66 n.10; *see also Lund*, 863 F.3d at 286 (looking to plurality opinion for rule on coercion). Aside from holding that legislative prayer could be sectarian, the Court in *Town of Greece* rejected the challenger's claim that the prayer practice was unconstitutionally coercive. *See* 572 U.S. at 591. Writing for himself, Chief Justice Roberts, and Justice Alito, Justice Kennedy stated that "government may not coerce its citizens to support or participate in any religion or its exercise." *Id.* at 586 (quotations omitted). The coercion inquiry "remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." *Id.* at 587. (Justice Thomas, joined by Justice Scalia, would have gone further to hold that a prayer practice is not coercive unless

religious orthodoxy is enforced by "force of law and threat of penalty." *Id.* at 608 (Thomas, J., concurring) (quotations omitted).)

Applying this "fact-sensitive" test to the House practice here, we hold that the pre-2017 sign and Speaker statement were not coercive. To begin, the sign and statement were merely requests to rise, which on their own are permissible. *See Bormuth*, 870 F.3d at 517 (concluding that asking "adult members of the public" to "ris[e] and remain[] quiet in a reverent position" was not coercive). "[L]egislative prayer does not force religious practice on an audience." *Mayle*, 891 F.3d at 685. The challengers here are adults, "presumably not readily susceptible to religious indoctrination or peer pressure." *Marsh*, 463 U.S. at 792 (quotations omitted). Nor is this situation analogous to a request to stand in a school setting. *See Lee*, 505 U.S. at 596–97 (Kennedy, J.) (school-prayer coercion case explicitly distinguishing *Marsh*); *Town of Greece*, 572 U.S. at 590 (explicitly distinguishing *Lee*).

Next, the setting here is even less conducive to coercion than it was in *Town of Greece*. Unlike the intimate meeting room there, the Pennsylvania House chamber accommodates over 200 members and nearly 100 visitors in the gallery. A small townhall is more coercive than a large legislative chamber. *See, e.g.*, *Town of Greece*, 572 U.S. at 625–27 (Kagan, J., dissenting). Unlike Pennsylvania House members, county commissioners and town councilors have more direct control over their constituents' daily lives and typically hear citizen petitions immediately after the prayer. *See Lund*, 863 F.3d at 287–88.

That Fields and Rhoades felt offended by the prayers does not aid their claim of coercion. "[L]egislative bodies do not engage in impermissible coercion merely by exposing

37

constituents to prayer they would rather not hear and in which they need not participate." *Town of Greece*, 572 U.S. at 590.

To be sure, one aspect of the House practice weighing in favor of coercion is the identity of the person asking visitors to rise: the Speaker of the House. This makes the situation more coercive than one in which a guest chaplain makes the request, and it separates our case from *Town of Greece*. *See id.* at 588. The Fourth Circuit in *Lund* distinguished *Town of Greece* in the same way to strike down a practice in which county commissioners asked attendees to rise and led them in prayer. *See Lund*, 863 F.3d at 272. When the words "[l]et us pray" come from "elected representatives acting in their official capacity," the Court concluded, "they become a request on behalf of the state." *Id.* at 287.

Even so, two factors cut against the importance of the Speaker's role in the request to rise. His request is typically followed by a prayer from a guest chaplain (not from another lawmaker, as in *Lund*). And the Speaker still asks visitors to rise today, yet the nontheists have abandoned their challenge to the current policy.

In sum, the pre-2017 sign and Speaker statement were not coercive.

**Conclusion**

We affirm in part and reverse in part. The House's policy preferring theistic over nontheistic prayers does not violate the Establishment Clause because it fits squarely within the historical tradition of legislative prayer. Next, legislative prayer is government speech, so the policy is not susceptible to an attack on free-speech, free-exercise, or equal-protection grounds. Finally, the sole incident of pressure from a security

38

guard is moot, and the general practice pre-2017 of asking the visitors' gallery to rise for the opening prayer was not coercive.

RESTREPO, *Circuit Judge*, concurring in part and dissenting in part.

I join the majority opinion only with respect to the majority's analysis of the Pennsylvania House's pre-2017 policy of requesting that members of the public "please rise" during opening prayers, in which the majority holds that all aspects of the policy are either constitutionally permissible or moot. I respectfully dissent from the remainder of the majority opinion because, in my view, the Pennsylvania House's process of selecting guest chaplains violates the Establishment Clause of the First Amendment.[1]

As the Supreme Court has recognized, Plaintiffs are members of "religions" for purposes of the First Amendment. *See Torcaso v. Watkins*, 367 U.S. 488, 495 n.11 (1961) ("Among *religions* in this country which do not teach what would generally be considered a belief in the existence of God are . . . Ethical Culture, Secular Humanism[,] and others." (emphasis added)). Plaintiffs simply seek the opportunity to deliver prayers at the opening of the Pennsylvania House's legislative days that reflect their religious beliefs. The Pennsylvania House, however, denied Plaintiffs such an opportunity solely on the grounds that their religious beliefs do not comport with the Pennsylvania House's preferred religious beliefs and that Plaintiffs, thus, are incapable of delivering a

---

[1] Because I would hold that the Pennsylvania House's guest-chaplain policy violates the Establishment Clause, I would not reach—and, in this opinion, I do not discuss—Plaintiffs' claims arising under the Free Speech and Free Exercise Clauses of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

"prayer" within the Pennsylvania House's conception of that term. In my view, the Pennsylvania House's policy of explicitly and purposefully excluding certain persons from serving as guest chaplains solely on the basis of their religions and religious beliefs finds no refuge in the history and tradition of legislative prayer in this country. Further, even assuming *arguendo* that the Pennsylvania House's purposeful exclusionary policy indeed fits within the history and tradition of legislative prayer in the United States, the policy nonetheless violates core tenets of the Establishment Clause by instituting an impermissible "religious orthodoxy," *Town of Greece v. Galloway*, 572 U.S. 565, 581 (2014), and by, in effect, "direct[ing] and controll[ing] the content of . . . prayers," *Lee v. Weisman*, 505 U.S. 577, 588 (1992).

Rather than acknowledging these violations of the Establishment Clause, the majority accommodates the Pennsylvania House's purposeful discrimination against Plaintiffs, their religions, and their religious beliefs by concluding that (i) "the purpose of legislative prayer is to invoke divine guidance," (ii) "'prayer' presupposes a higher power," and (iii) Plaintiffs, because their religious beliefs do not include a belief in a "higher power" or God, cannot offer a "prayer." This line of reasoning by necessity involves answering sensitive questions about what constitutes the "divine" and what words must be strung together for a speech to constitute a "prayer," which, in my view, are precisely the type of questions that the Establishment Clause forbids the government—including courts—from answering. I therefore respectfully dissent.

2

## I.

In analyzing whether the Pennsylvania House's guest-chaplain policy is permissible under the Establishment Clause, we must "determine whether the prayer practice . . . fits within the tradition long followed in Congress and the state legislatures." *Town of Greece*, 572 U.S. at 577. When framing the contours of the relevant prayer practice, courts should be "specific," and "where history shows that the *specific* practice is permitted," "it is not necessary [for courts] to define the precise boundary of the Establishment Clause." *Id.* (emphasis added) (citing *Marsh v. Chambers*, 463 U.S. 783 (1983)).

In devising the key inquiry in this case, the majority, in my view, frames the Pennsylvania House's guest-chaplain policy in a way that is too broad and that does not capture the true exclusionary nature of the policy. Relying on the D.C. Circuit's opinion in *Barker v. Conroy*, 921 F.3d 1118 (D.C. Cir. 2019), the majority formulates the key inquiry as whether "the House's decision to limit the opening prayer to religious[2] prayer fit[s] 'within the tradition long followed in Congress and the state legislatures,'" *id.* at 1130 (quoting *Town of Greece*, 572 U.S. at 577).

Conceptualizing the Pennsylvania House's guest-chaplain policy as "limiting" prayer to theistic prayer is not *technically* an incorrect way to express the contours of the

---

[2] I assume that by "*religious* prayer," the majority intended to convey that the Pennsylvania House "limits the opening prayer to *theistic* prayer." If the Pennsylvania House limited opening prayer to "religious" prayer, Plaintiffs would not have been excluded because they are indeed members of "religions." *See Torcaso*, 367 U.S. at 495 n.11.

policy, but framing the policy in such a way omits the most notable and constitutionally suspect facet of the policy: the Pennsylvania House purposefully excludes adherents of certain religions and persons who hold certain religious beliefs from serving as guest chaplains and, consequently, prohibits them from delivering opening prayers. Saying that the Pennsylvania House merely "limits" legislative prayer to theistic prayer fails to capture the purposeful exclusionary actions undertaken by the Pennsylvania House to ensure that its prayer practice is "limited" to theistic prayer; under the majority's formulation, it is equally as likely that the prayer offered by guest chaplains simply is "confine[d] within [the] limits" of theistic prayer through no voluntary action on the part of the Pennsylvania House whatsoever. *Limit*, Oxford English Dictionary (3d ed. 2014).

By framing the Pennsylvania House's prayer practice as simply being "limited" to theistic prayer, the majority's ultimate holding is nothing more than a foregone conclusion: the prayer practice at issue in *Town of Greece v. Galloway*, 572 U.S. at 571, which the Supreme Court upheld, could properly be described as one that was "limited" to theistic prayer because all of the guest ministers in that case belonged to theistic religions and were nearly all Christian. What distinguishes *Town of Greece* from this case, however, is that the town council in *Town of Greece* "at no point excluded or denied an opportunity to a would-be prayer giver," and "[i]ts leaders maintained that a minister or layperson of any persuasion, including an atheist, could give the invocation." *Id.* In *Town of Greece*, the prayers offered at the beginning of town board meetings were "limited" to theistic prayers simply by virtue of the fact that "nearly all of the congregations in town were Christian," and therefore ministers of other religions

4

generally were not available to deliver the prayers. Here, by contrast, the Pennsylvania House explicitly and purposefully excludes persons who hold Plaintiffs' religious beliefs from serving as guest chaplains and from delivering opening prayers, but the majority's framing of the Pennsylvania House's guest-chaplain policy fails to capture this crucial distinction.

Thus, in my view, the key inquiry in this case is more properly formulated as "whether the Pennsylvania House's policy of purposefully excluding persons of certain religious faiths from serving as guest chaplains fits 'within the tradition long followed in Congress and the state legislatures.'" *Id.* at 577. When framed in this way, the answer to this question is clearly "no." The First Congress intended legislative prayer "to be inclusive rather than divisive." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2088 (2019) (Kavanaugh, J.) (plurality opinion). Members of the First Congress held divergent views regarding the motion to appoint a congressional chaplain, but Samuel Adams ended debate on the motion by supporting it: "I am no bigot. I can hear a prayer from a man of piety and virtue, who is at the same time a friend of his country." Derek H. Davis, *Religion and the Continental Congress, 1774–1778*, at 74 (2000) (quoting Adams). Throughout the early years of the Republic, Congress maintained this policy of inclusion. In 1853, the Judiciary Committees of the House of Representatives and the Senate concluded that "no faith was excluded by law, nor any favored" in the selection of congressional chaplains. *Town of Greece*, 572 U.S. at 576.

This history demonstrates that legislative prayer, as envisioned by the First Congress and as subsequently practiced

5

by Congress since then, *never* involved the purposeful exclusion of persons from consideration to serve as chaplains on the basis of their religions or religious beliefs. This lack of a history of purposeful, religion-based discrimination in legislative prayer is what, in my view, animates the anti-discrimination language in *Town of Greece*. *See id.* at 585–86 ("So long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing."). And by virtue of the fact that the history and tradition of legislative prayer in this country is thus devoid of any history of purposeful exclusion of persons from serving as chaplains based on their religions or religious beliefs, the Pennsylvania House's guest-chaplain policy—which purposefully excludes adherents of Plaintiffs' religions and persons who hold Plaintiffs' religious beliefs from serving as guest chaplains—does not fit "within the tradition long followed in Congress and the state legislatures" and therefore violates the Establishment Clause. *Id.* at 577.

The majority's response to this line of reasoning is that it "doubt[s] whether the Congress of 1853"—which found that "no faith was excluded by law, nor any favored" in the selection of congressional chaplains, *id.* at 576—"understood atheism as a 'faith,' given that its study was from an era that still defined 'religion' as 'one's views of his relations to his Creator.'" This cannot possibly be a standard around which to build Establishment Clause jurisprudence. Such a standard would permit, for example, a legislature to purposefully exclude all adherents of Buddhism, the world's fourth largest religion by population, from delivering legislative prayers because Buddhists do not believe in a "Creator": "If absence of a Creator-God is atheism, Buddhism is atheistic." Huston

6

Smith, *The World's Religions* 114 (rev. & updated ed. 1991). It is unconscionable to think that the Establishment Clause permits legislatures to purposefully exclude all Buddhists from delivering legislative prayers, and it should be equally unconscionable to think that the Establishment Clause permits such purposeful exclusion of persons who hold Plaintiffs' religious beliefs because there is no principled difference between Buddhism and Plaintiffs' religions in this regard.[3]

In sum, the majority, in my view, paints with too broad a brush in framing the question with respect to whether the Pennsylvania House's guest-chaplain policy fits within the tradition of legislative prayer that has long been followed in Congress and the state legislatures. The defining characteristic

---

[3] The fact that a Buddhist previously has delivered a prayer in the United States Senate is immaterial to the issue of whether Congress—or any other legislature—may *later* purposefully exclude Buddhists from delivering legislative prayers under the majority opinion. The only manageable standard that I can glean from the majority opinion in this regard is that a legislature cannot, at some later point, purposefully exclude members of a nontheistic religion from delivering legislative prayers once that legislature welcomes a member of that nontheistic religion to deliver a legislative prayer. Such a rule would lead to absurd results. For example, the Pennsylvania Senate, which previously has welcomed adherents of Plaintiffs' religions to serve as guest chaplains, would be prohibited from later choosing to exclude adherents of such religions from serving as guest chaplains, even though the majority today holds that the Pennsylvania House *can*, as a matter of constitutional law, exclude such persons from serving as guest chaplains.

of the Pennsylvania House's policy is that it purposefully excludes adherents of Plaintiffs' religions and persons who hold Plaintiffs' religious beliefs from serving as guest chaplains, but the majority's formulation of the key inquiry in this case omits any reference to such purposeful exclusion. Purposeful exclusion of adherents of certain religions or persons who hold certain religious beliefs has never been countenanced in the history of legislative prayer in the United States, and, therefore, viewed in the proper context, the Pennsylvania House's guest-chaplain policy does not fit "within the tradition long followed in Congress and the state legislatures" because it purposefully excludes persons from serving as guest chaplains solely on the basis of their religions and religious beliefs.[4] *Town of Greece*, 572 U.S. at 577.

---

[4] I am not persuaded otherwise by what the majority construes as the Supreme Court's alleged "tak[ing] as given that prayer presumes a higher power." To support this contention, the majority primarily cites passages from *Marsh v. Chambers*, 463 U.S. 783, and *Town of Greece* in which the Supreme Court, in the words of the majority, "*described* legislative prayer" as a practice that involves the invocation of a "higher power" or God. It is only natural that the Supreme Court *described* legislative prayer in these terms: until recently, nearly all legislative prayer in this country happens to have been explicitly theistic in nature. It is quite a different thing to construe this *description* in dicta as tantamount to a holding that legislative prayer *must* be theistic in nature to qualify as such.

The majority also lends a great deal of weight to then-Judge Ginsburg's dissenting opinion in *Kurtz v. Baker*, 829

F.2d 1133 (D.C. Cir. 1987), a dissent in a case decided in 1987 by a court of appeals other than our own.  In relying heavily on this dissent, the majority implicitly makes a number of presumptions that I am not willing to make, including (i) that now-Justice Ginsburg's views on this issue have not evolved in the intervening thirty-two years; (ii) that Justice Ginsburg's views would not change given the particular facts of this case, which are distinguishable from those in *Kurtz* insofar as the plaintiff in that case did not wish to deliver a "prayer," but rather "opening remarks" as a "guest speaker, *id.* at 1146 (Ginsburg, J., dissenting), whereas here, Plaintiffs explicitly wish to deliver "prayers" as "guest chaplains"; and (iii) that, for reasons not stated, the views expressed solely by Justice Ginsburg in a dissenting opinion in a factually distinguishable case decided by a court of appeals thirty-two years ago are apparently decisive on this particular issue.

Finally, it is not clear to me how the Eleventh Circuit's opinion in *Williamson v. Brevard County*, 928 F.3d 1296 (11th Cir. 2019), supports the majority's position.  The Eleventh Circuit did not reach the issue of whether a government can exclude persons with nontheistic religious beliefs from delivering legislative prayers, and it chose not to reach that issue explicitly as a matter of "*judicial restraint.*"  *See id.* at 1317 (emphasis added) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988)).  That court already had found that the relevant legislative body's prayer practice "plainly" violated the Constitution, even setting aside the discrimination against persons with nontheistic beliefs in particular, and thus the court determined, as a prudential matter, that it was unnecessary to adjudicate any of the plaintiffs' further claims.  *Id.* at 1316.  Thus, the Eleventh

9

**II.**

Even assuming *arguendo* that the Pennsylvania House's guest-chaplain policy indeed fits within the tradition of legislative prayer that has long been followed in Congress and the state legislatures, that fact alone, in my view, would not save the policy. The Supreme Court has held that, "standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees" in the context of legislative prayer. *Marsh*, 463 U.S. at 790; *see also Town of Greece*, 572 U.S. at 576 ("*Marsh* must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation."). In my view, even if the Pennsylvania House's exclusionary guest-chaplain policy fits within the history and tradition of legislative prayer in this country—which, for the reasons stated above, it does not—the policy nonetheless additionally runs afoul of the Establishment Clause by instituting a religious orthodoxy and by directing and controlling the content of legislative prayer.

At its core, the Establishment Clause requires the government to remain "neutral in matters of religious theory, doctrine, and practice," and the government "may not aid, foster, or promote one religion or religious theory against another." *Epperson v. Arkansas*, 393 U.S. 97, 103–04 (1968). This neutrality principle mandates that the "[g]overnment may not . . . prescribe a religious orthodoxy." *Town of Greece*, 572 U.S. at 581.

---

Circuit did not, as the majority argues, draw a constitutional distinction between theistic prayer and nontheistic prayer—it simply concluded that it was neither necessary nor prudent to take up the issue of nontheistic prayer. *See id.* at 1316–17.

10

The Establishment Clause also prohibits the government from "defin[ing] permissible categories of religious speech." *Id.* at 582. For example, "government in this country, be it state or federal, is without power to prescribe . . . any particular form of prayer which is to be used as an official prayer in carrying on any program of governmentally sponsored religious activity." *Engel v. Vitale*, 370 U.S. 421, 430 (1962). The Supreme Court has held that it is a "cornerstone principle of . . . Establishment Clause jurisprudence" that the government may not "direct[] and control[] the content of . . . prayers" delivered at government-sponsored public events. *Lee*, 505 U.S. at 588.

Through the implementation of its guest-chaplain policy, the Pennsylvania House violates both of these tenets of the Establishment Clause. By mandating that all guest chaplains profess a belief in a "higher power" or God, the Pennsylvania House fails to stay "neutral in matters of religious theory"; in effect, the Pennsylvania House "promote[s] one . . . religious theory"—belief in God or some sort of supreme deity—"against another"—the denial of the existence of such a deity. *Epperson,* 393 U.S. at 103–04. This is not to say that a government violates the neutrality principle simply by consistently selecting guest ministers who *happen* to believe in a "higher power"—legislative prayer that is even explicitly sectarian and almost uniformly Christian in nature has been approved by the Supreme Court. *See Town of Greece*, 572 U.S. at 581. But when, as here, the government subjects prospective guest chaplains to a litmus test of whether they believe in the existence of a "higher power" or God, the government actively lends its power and prestige to the religious theory that a "higher power" or God indeed exists, thus violating the Establishment Clause's neutrality principle

11

and instituting belief in a supreme deity as "religious orthodoxy."[5] *See Engel*, 370 U.S. at 431 ("When the power [and] prestige . . . of government is placed behind a particular religious belief, the indirect coercive pressure upon religious

---

[5] To be clear, I do not believe that the inclusion of the phrases "In God We Trust" on United States currency and "under God" in the Pledge of Allegiance raises similar constitutional concerns. In my view, the government's passive speech in the form of text on currency and through the approval of the official text of the Pledge is categorically different than the government's actively and purposefully excluding persons from participating in a government-sponsored activity based solely on their belief or disbelief in a "higher power" or God. The nature of the actions are meaningfully different: in the former case, the government exercises its power merely to approve text and mottos, but in the latter case, the government plays an active role, exercising its power to purposefully discriminate against citizens solely on the basis of their religious beliefs. Indeed, even in the context of the Pledge, when the government has attempted to exercise its power in a way that exceeds the mere approval of text, the Supreme Court has held that such actions violate the First Amendment. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (holding that the government cannot enforce a policy to compel persons to recite the Pledge because "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," and thus such a policy "transcends constitutional limitations on the[ government's] power").

minorities to conform to the prevailing officially approved religion is plain.").

The Pennsylvania House also impermissibly directs and controls the content of the prayers delivered by guest chaplains by only permitting persons who profess a belief in a "higher power" or God to serve as guest chaplains. If the Pennsylvania House instituted a rule that required all guest chaplains to include references to a "higher power" or God in their prayers, we undoubtedly would hold that such a rule clearly violates the Establishment Clause under current precedent. *Cf. Lee*, 505 U.S. at 588 (holding that the government violated the Establishment Clause by "advis[ing a clergyman] that his prayers [delivered at a high school graduation] should be nonsectarian" because such an attempt to "direct[] and control[] the content of the prayers" violates the "cornerstone principle of our Establishment Clause jurisprudence that 'it is no part of the business of government to compose official prayers'" (quoting *Engel*, 370 U.S. at 425)). The record suggests that the Pennsylvania House sought to accomplish this very goal—ensuring that prayers include references to a "higher power" or God—albeit indirectly through the guest-chaplain selection process. For example, the Speaker of the Pennsylvania House testified that a "prayer" should be "an *appeal* to a benevolent higher being" and that Plaintiffs were excluded because they could not deliver such a "prayer." App. 650:13–23 (emphasis added). The former Speaker of the Pennsylvania House testified that for a "prayer" to be acceptable, it must be *directed* "to a higher being and *ask*[] for intervention," *id.* at 712:18–19 (emphasis added), and that he would have rejected any prospective guest chaplains who indicated that they would not "*spell* [*out*] an actual [higher] being that [would] be[] *addressed*" in their prayers, *id.* at

13

714:24–25 (emphasis added). Further, the Parliamentarian of the Pennsylvania House testified that he was "very concerned about the *content*" of potential prayers, *id.* at 519:5 (emphasis added), and that there was a certain "*type* of prayer we would be *looking for*," *id.* at 523:22 (emphasis added).

Rather than instituting an outright requirement that guest chaplains include references to a "higher power" or God in their prayers, the Pennsylvania House simply addressed the issue one step earlier in the process by only selecting persons who professed a belief in a "higher power" or God to serve as guest chaplains and by purposefully excluding all others. While this action is more indirect in nature than an outright requirement that guest chaplains include references to a "higher power" or God in their prayers, the intentional effect on the content of the prayers that were actually delivered is the same; the Pennsylvania House exerted its power over the guest-chaplain selection process to ensure that the "prayers [that were] recited . . . promote[d] a preferred system of belief"—namely, belief in a "higher power" or God. *Town of Greece*, 572 U.S. at 581.

Thus, even setting aside the issue of whether the Pennsylvania House's guest-chaplain policy fits "within the tradition long followed in Congress and the state legislatures," *id.* at 577, the actions of the Pennsylvania House amount to an Establishment Clause violation. Pursuant to the Establishment Clause, a government can neither institute a religious orthodoxy nor direct or control the content of legislative prayer, but here, the Pennsylvania House sought to accomplish—and indeed succeeded in accomplishing—both of these constitutionally impermissible goals.

14

**III.**

A legislature is free to appoint a single chaplain, of a single denomination, for nearly two decades to deliver Christian opening prayers on an almost permanent basis, so long as the chaplain's appointment and reappointment did not "stem[] from an impermissible motive." *Marsh*, 463 U.S. at 793. A legislature is free to select guest ministers that are nearly all Christian and who deliver explicitly sectarian prayers, so long as the selection of such ministers "does not reflect an aversion or bias on the part of [legislators] against minority faiths." *Town of Greece*, 572 U.S. at 586. A legislature also is free to enact rules to exclude—as the majority phrases it—the "heckler," who may, among other things, "denigrate nonbelievers or religious minorities, threaten damnation, . . . preach conversion," or "disparage . . . other . . . faith[s] or belief[s]." *Id.* at 583 (quoting *Marsh*, 463 U.S. at 794–95).

What a legislature *cannot* do, however, is purposefully exclude persons from serving as guest chaplains—and thereby prohibit such persons from delivering legislative prayers—solely on the basis of such persons' religions or religious beliefs. *See id.* at 585–86. Yet that is *precisely* what the Pennsylvania House did here: the Pennsylvania House denied Plaintiffs—who, as the Supreme Court has recognized, are members of "religions" for the purposes of the First Amendment, *see Torcaso*, 367 U.S. at 495 n.11—the opportunity to serve as guest chaplains solely on the basis of their religions and religious beliefs.

The majority provides sanction to the Pennsylvania House's purposeful, religion-based discrimination by reasoning that whether Plaintiffs are members of a "religion"

15

for the purposes of the First Amendment is immaterial to the question at hand; rather, the "only . . . question" that is relevant, in the majority's view, is "whether [Plaintiffs] believe in a supreme being." In other words, while the Supreme Court has held that Plaintiffs are members of "religions" for First Amendment purposes, the majority holds that Plaintiffs are not members of "religions" for *these* First Amendment purposes because the only religions that "count" for *these* purposes are those that profess a belief in a "higher being" or God. In essence, the majority, in my view, casts Plaintiffs' religions as "second class."

The First Amendment knows no "first class" or "second class"; the Establishment Clause was intended to prohibit the government from making such distinctions. Courts should not make such distinctions, and we need not make such distinctions—including with respect to whether persons of certain religions possess the ability to offer a "prayer"—to adjudicate the facts of this case. When framed properly, the Pennsylvania House's policy of purposefully excluding persons from serving as guest chaplains solely on the basis of their religions and religious beliefs does not fit within the inclusive tradition of legislative prayer that has long been followed in Congress and the state legislatures, and for this reason, among other reasons, the policy violates the Establishment Clause. I thus would affirm the judgment of the District Court in this regard.

Therefore, for the reasons stated above, I respectfully dissent.

16